## STATE EX REL. STAIN v. CHRISTENSEN ET AL.

No. 5515. Decided May 4, 1934. (35 P. [2d] 775.)
Rehearing Denied September 22, 1934.

186

*Claude T. Barnes,* of Salt Lake City, for plaintiff.

*O. L. Huntsman,* of Salt Lake City, for defendant Christensen.

*Joseph Chez,* Attorney General, and *S. D. Huffaker,* Deputy Attorney General, for defendant Hoge.

ELIAS HANSEN, Justice.

By this proceeding in quo warranto the parties have invoked the original jurisdiction of this court for the purpose of determining who is the Treasurer of the State of Utah. The facts are not in dispute. A. Edsel Christensen was elected State Treasurer in the general election held in 1928. He took the oath of office and filed a bond as required by law and assumed the duties of that office on the first Monday in January of 1929, and from that time to the present has continued to act as State Treasurer. In the general election

of 1932 Charles A. Stain was elected State Treasurer. He took the oath of office on the first Monday in January, 1933, but has failed to give any bond. On December 12, 1933, the Governor appointed Enos Hoge State Treasurer. He took the constitutional oath of office and on January 4, 1934, filed his bond with the proper officers. Charles A. Stain claims that he is, and since the first Monday in January, 1933, has been, the State Treasurer. He further contends that the law with respect to the giving of a bond casts upon the State Board of Supply and Purchase the duty of furnishing his bond, and that if the law be so construed as to cast upon him the necessity of giving a bond before he may lawfully assume the duties of State Treasurer, then such law is unconstitutional because it is an attempt to add qualifications to the office of State Treasurer not authorized by, but contrary to, the provisions of our State Constitution. It is urged on behalf of A. Edsel Christensen that he is entitled to retain the office of State Treasurer until his successor has been elected and has taken the oath as required by the Constitution and has given a bond as required by law; that the Governor was without legal authority to appoint Enos Hoge to the office of State Treasurer because there was no vacancy in that office.

Enos Hoge contends that Mr. Stain has forfeited his right to the office because of his failure to give a bond within the time provided by law; that the term for which Mr. Christensen was elected expired in January, 1933, leaving a vacancy in that office; that the Governor having appointed him to fill that vacancy and he having taken his oath and filed his bond, he is entitled to that office.

The provisions of our state Constitution which it is claimed have a bearing on the question which divides the parties are:

Article 24, § 16:

"The provisions of this Constitution shall be in force from the day on which the President of the United States shall issue his proc-

lamation, declaring the State of Utah admitted into the Union; and the terms of all officers elected at the first election under the provisions of this Constitution, shall commence on first Monday, next succeeding the issue of said proclamation. Their terms of office shall expire when their successors are elected and qualified under this Constitution."

### Article 7, §§ 1 and 3:

Section 1. "The Executive Department shall consist of Governor, Secretary of State, State Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction, each of whom shall hold his office for four years, beginning on the first Monday of January next after his election, except that the terms of office of those elected at the first election shall begin when the State shall be admitted into the Union, and shall end on the first Monday in January, A. D. 1901. The officers of the Executive Department, during their terms of office, shall reside at the seat of government, where they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this Constitution and as may be prescribed by law."

Section 3: "* * * No person shall be eligible to any of the offices provided for in section one of this article, unless at the time of his election he shall be a qualified elector, and shall have been a resident citizen of the State or Territory for five years next preceding his election. The State Auditor and State Treasurer shall be ineligible to election as their own successors."

### Article 4, § 10:

"All officers made elective or appointive by this Constitution or by the laws made in pursuance thereof, before entering upon the duties of their respective officers, shall take and subscribe the following oath or affirmation: 'I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this State, and that I will discharge the duites of my office with fidelity.'"

### Article 7, § 10:

"* * * If the office of * * * State Treasurer * * * be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified, as may be by law provided."

Article 24, § 2:

"All laws of the Territory of Utah now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed by the Legislature."

At the time Mr. Stain was elected the law provided:

"The state treasurer shall give to the state a surety company bond in the sum of $350,000.00; the premium of said bond shall be paid by the state." Laws of Utah 1921, c. 129 p. 362.

"The state treasurer shall give a separate and additional corporate surety bond in such amount as may be fixed by the governor, conditioned upon the faithful performance of his duties as custodian of the state insurance fund. The premium of said bond shall be paid out of the state insurance fund." Comp. Laws Utah 1917, § 3109, p. 670.

"Whenever state officers, officials of state institutions, or other persons are required to give official bonds to the state, such bonds shall be approved by the state board of examiners, and recorded by the secretary of state in a book to be kept for that purpose. * * *" Comp. Laws Utah 1917, § 4306.

At the time of the adoption of our state Constitution and the admission of Utah into the Union, the law of the territory of Utah provided:

"The Territorial Treasurer shall, before entering upon the duties of his office, * * * give a bond to the Territory of Utah in such sum not exceeding the whole amount of the revenue of the Territory for the year next preceding his election, nor less than one-half thereof; and with such sureties as the auditor of public accounts and the probate judge of Salt Lake county shall determine and approve, conditioned for the faithful performance of the duties of said office * * *" Comp. Laws Utah 1888, vol. 1, c. 3, p. 250, § 9.

The first Legislature to convene after statehood passed a law which required that:

"The State Treasurer must execute an official bond in the sum of three hundred and fifty thousand dollars." Laws of Utah 1896, c. 53, § 8, p. 143.

The second special session of the Legislature of 1933 enacted two laws, one of which provided that all public

officers who are by law required to give bonds may give personal bonds in lieu of surety bonds. It was further provided that:

"In case of failure of any public officer to have his sureties justify when so required or to furnish additional sureties when required, as herein provided, the board or officer charged with the duty of approving the bond of such officer shall declare such office vacant within sixty days after notice personally served upon the officer, and at the expiration of said sixty day period such office shall become vacant unless such sureties justify or additional qualified sureties be furnished within said period."

That act took effect October 2, 1933, Second Special Sesssion Laws of Utah 1933, c. 13, p. 26. The other act of the Second Special Session contained, among others, the following provisions:

"Whenever any person duly elected or appointed to any office of the state or any of its political subdivisions, fails to qualify for such office within sixty days after the date of beginning of the term of office for which he was elected or appointed, such office shall thereupon become vacant and shall be filled as provided by law. * * * Any elected or appointed official who has failed on the effective date of this act to qualify for the position to which he was elected or appointed, shall be deemed to come within the provisions of this act, and the office of such officer shall become vacant at the end of forty days after the effective date of this act unless legal bond is given before the expiration of such period, and such office shall be filled as provided by law."

That act also took effect October 2, 1933. Second Special Session Laws of Utah 1933, c. 25, p. 50.

Our state Constitution contains no express provisions relative to the giving of a bond by the treasurer or other state officer, nor does it expressly authorize the lawmaking power of the state to require the giving of a bond by any of such officers. It is Mr. Stain's contention that it was not competent for the Legislature to add to the requirements contained in article 7, § 3, and article 4, § 10, of our state Constitution, as a condition precedent to his right to assume the duties and enjoy the emoluments of

the office of State Treasurer. In support of such contention he cites numerous authorities and adjudicated cases. Most of the cases relied upon by him will be found collected in the footnotes in 46 C. J. 937, 59 C. J. 117 and 113, and Cooley's Constitutional Limitations (8th Ed.) vol. 1, pp. 139 to 141. We have carefully examined the cases relied upon by Mr. Stain. A considerable number of them support the doctrine that a constitutional declaration that certain persons are ineligible to office implies that all other persons are eligible. A different doctrine prevails in some jurisdictions, as will be seen from an examination of the following cases: *Darrow* v. *People ex rel. Norris*, 8 Colo. 417, 8 P. 661; *State ex rel. Thompson* v. *McAllister, Mayor*, 38 W. Va. 485, 18 S. E. 770, 24 L. R. A. 343; *State ex rel. Atty. Gen'l* v. *Covington et al.*, 29 Ohio St. 102. None of the cases cited go to the extent of holding that the Legislature may not require the officer whose qualifications are fixed by the Constitution to give a bond as an assurance for the faithful accounting for money received by him in his official capacity. It will be observed that article 7, § 3, deals with eligibility of persons for the offices therein named at the time of the election. This court, in the case of *State by Barnes, Attorney General, ex rel. Korns* v. *Shores*, 48 Utah 76, 157 P. 225, 226, in distinguishing between the meaning of eligibility and qualification for office, said:

"There is a clear distinction between 'eligible,' as used in section 221, and 'qualification,' as used in the Laws of 1899. The former means capable of being legally chosen, and relates to the legal capacity of being appointed, elected, or chosen, as well as holding (3 Words and Phrases and 2 Words and Phrases, Second Series); the latter, fitness of the person for the particular pursuit or performance of duties of the office or position to which he is chosen (7 Words and Phrases)."

It was held in that case that a statute which provides that no person shall be eligible to such office (in cities and towns) who is not a qualified elector of the city was not repealed by the later statute which conferred express power

on the city council to prescribe and define by ordinance the qualifications and duties of officers and employees.

In the case of *State of North Carolina by Attorney General Hargrove ex rel. Lee* v. *Dunn*, 73 N. C. 595, it is said:

"All the difficulty in arriving at the proper solution of this question, grows out of not drawing the distinction between *eligibility* or *qualifications* for office; and *assurances* for the *faithful discharge* of the *duties* of the office. * * *

"After prescribing who are eligible to office, the Constitution, in section 4, provides that every one, before entering upon the duties of office, shall take an oath to support the Constitution, and to be faithful in office. But this does not enter into *eligibility* for office. One must be eligible when elected; the oath is after election. It is simply an *assurance* which one is to give after election, and before entering into the office that he will be faithful to the government and to his office, which assurance is binding on his conscience. And this is the only assurance required of many officers, such as the Governor, members of the General Assembly, Judges, etc. And that is the only *assurance* which is required *in terms* by the Constitution.

"But can it be supposed that every other assurance is prohibited? If so, then no bond can be required; and so the public funds, and all moneys in the hands of officials, are in jeopardy. This proposition is so monstrous that it was admitted for the relator that a bond and surety could be prescribed by the Legislature and demanded by the Board, although none is prescribed by the Constitution. But by what reasoning can it be maintained that a bond may be required? Only upon the ground that a bond is a reasonable and proper *assurance* for the public safety; a *regulation* which experience has shown to be necessary; reasonable in itself, and deprives no man of his rights, and is not intended, directly or indirectly, to abridge them. Cooley's Const. Lim., 1, 602. If that reasoning is sound, as unquestionably it is then any other assurance which can be supported by the same reasoning may be required."

There is eminent authority and good reason to support the doctrine that when a Constitution prescribes eligibility for an office, its declarations are conclusive of the whole matter whether the language used is affirmative or negative in form. But so far as we are advised that rule has never been extended to preclude the lawmaking power from requiring the giving of a bond by one elected to an office,

upon the theory that such a law is in conflict with constitutional provisions such as are contained in our state Constitution. When a constitutional provision deals with the subject-matter of eligibility to office, much may be and has been said in favor of the view that such provision disposes of the whole matter of eligibility to office. But we can perceive of no sound basis for extending the implication to include matters foreign to the subject-matter of eligibility to office, such as the giving of a bond for the protection of moneys which may come into the possession of an officer after he assumes office. So, likewise, a constitutional provision requiring the taking of an oath is so foreign to the giving of a bond that a requirement that an officer must take an oath of office may not well be said to imply that a bond may not be required.

It is the established doctrine in this and other jurisdictions that the whole lawmaking power is committed to the Legislature except such as is expressly or impliedly withheld by our federal and state Constitutions. *Kimball* v. *Grantsville City et al.*, 19 Utah 368, 59 P. 1, 45 L. R. A. 628. That it is competent and proper for the Legislature to enact laws for the protection of public money is not open to doubt. Long before Utah was admitted to statehood, an act of the territorial Legislature was passed requiring the giving of a bond by the treasurer of the then territory of Utah, which law was in effect at the time of the adoption of our state Constitution, and in amended form has continued in effect until the present time. The Constitution expressly provides that all territorial laws not in conflict with the Constitution should remain in force until altered or repealed by the state Legislature. Moreover, the language of article 7, § 10, wherein it is provided that certain officers appointed by the Governor shall hold office until their successors shall be elected and qualified, *as may be by law provided*, lends support to the claim that the Constitution was not intended to preclude the Legislature from requiring the giving of a bond by officers intrusted with

public moneys. It is difficult to believe that those who took part in drafting our state Constitution or the people who voted for its adoption believed that anything therein contained precluded the Legislature from requiring a public officer who is intrusted with the custody of public moneys to give a bond as an assurance for the faithful accounting of such moneys.

By numerous decisions it is the established doctrine in this jurisdiction that an act of the lawmaking power may not be declared unconstitutional unless such act is clearly in conflict with some provision of our state or federal Constitution. The authority of the Legislature to require the State Treasurer to give a bond may be sustained under that provision of article 7, § 1, of our state Constitution, wherein it is provided that the State Treasurer "shall perform such duties as are prescribed by this Constitution and as may be prescribed by law." The requirement that the State Treasurer shall give a bond may in a sense be said to be a duty imposed upon him. Such is the view expressed in the dissenting opinion of Mr. Justice MOFFAT. To so classify the giving of a bond, however, does not solve the question which is here presented for determination. Assuming for the moment that Mr. Stain became the de jure State Treasurer when he took his oath of office, how stands the case? As soon as he became such de jure officer he was required to perform the duties of that office, one of which was to give a bond as by law required. The power expressly granted by the Constitution to the Legislature to prescribe the duties of State Treasurer carried with it such implied power as was necessary to the effective exercise of the power so expressly granted. If the moneys of the state in the hands of the State Treasurer are to be at all times protected by a bond, it is obviously necessary that the bond be given before the moneys are turned over to an in-coming State Treasurer. But it is urged in the dissenting opinion that the law as it existed when Mr. Stain took his oath of office did not require him to furnish a bond

before he assumed the other duties of State Treasurer. That is so, but neither did the law fix any other time when the bond should be furnished. It is one of the cardinal principles applied by courts in the construction of a statutory provision to so construe it as to give effect to the purposes sought to be accomplished by the lawmaking power. It would seem clear that one of the principal purposes sought to be accomplished by the act requiring the State Treasurer to give a bond was to protect the moneys which should come into his hands. Complete protection may not be afforded unless the in-coming State Treasurer furnishes a bond before the state moneys are placed in his custody. Loss to the state may occur the first day or the first week of the term of office as well as at any other time. The statute requiring the State Treasurer to give a bond, being silent as to when such bond should be given, should receive such a construction as to give full effect to the purposes sought to be accomplished by the act. If the act requiring the State Treasurer to give a bond be viewed as prescribing the duties of the State Treasurer, it should be so construed as to require the performance of that duty by the in-coming State Treasurer before and not after he enters upon the performance of the other duties of that office.

While we have been unable to find an adjudicated case which bases the power of the Legislature to require a bond from the State Treasurer upon the doctrine of the police power of the state, still the principle upon which that doctrine is bottomed supports such a law.

It was said by Mr. Justice Holmes, in the case of *Noble State Bank* v. *Haskell*, 219 U. S. 104, 31 S. Ct. 186, 188, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, that:

"It may be said in a general way that the police power extends to all the great public needs. * * * It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

It was said by Mr. Justice Wanamaker, in *Leonard* v. *State*, 100 Ohio St. 456, 127 N. E. 464, 465, that:

"The dimensions of the government's police power are identical with the dimensions of the government's duty to protect and promote the public welfare. The measure of police power must square with the measure of public necessity. The public need is the polestar for the enactment, interpretation, and application of the law. If there appears in the phrasing of the law and the practical operation of the law a reasonable relation to the public need, its comfort, health, safety, and protection, then such act is constitutional, unless some express provision of the Constitution be clearly violated in the operation of the act.

"Moreover the growth of the police power must from time to time conform to the growth of our social, industrial, and commercial life. You cannot put a strait-jacket on justice any more than you can put a straight-jacket on business. Private initiative, enterprise, and public demand are constantly discovering and developing new methods and agencies, honest and dishonest; and the police power must be always available to afford apt and adequate protection to the public."

The Supreme Court of Wisconsin has said:

"The doctrine that the police power is really a law of necessity forms the key, it would seem, with which to unlock the mysteries, so far as practicable, of what is within and what is without the limits of such power. Not that a police regulation, in form or pretense, to be one in fact must supply some absolute essential to the public welfare, but that the exigency to be met must so concern such welfare, be sufficiently vital thereto, as to suggest some reasonable necessity for a remedy affordable only by a legislative enactment." *State* v. *Redmon*, 134 Wis. 89, 114 N. W. 137, 142, 14 L. R. A. (N. S.) 229, 126 Am. St. Rep. 1003.

We are clearly of the opinion that it was competent for the Legislature to enact the law requiring the State Treasurer to give a bond. Nor is that law susceptible of the construction that it was the duty of the State Board of Supplies and Purchase, and not of Mr. Stain, to secure the required bond.

It is next urged that Mr. Stain may not be deprived of his right to give bond until the expiration of the term for which he was elected. We cannot yield assent to such view.

It is now more than a year since the term of office for which he was elected began. So far as appears, his prospects for now securing a bond are no better than they were when he was elected. It will be noted that under the provisions of Second Special Session Laws of Utah 1933, c. 25, Mr. Stain was given forty days after the effective date of the act in which to qualify. Upon his failure to do so, the act provides that he thereby forfeited his right to the office. Mr. Stain was thus given to and including November 11, 1933, in which to furnish his bond. If it was competent for the Legislature to require Mr. Stain to furnish a bond, as we have held it was, so, likewise, it was competent for the Legislature to make provision that in the event he failed to furnish a bond within the specified time he forfeited his right to the office. He frankly concedes that he has been unable to give the required bond, and so far as it is made to appear there is no likelihood that he will be able to give such a bond. The Legislature may well have believed that the administration of public affairs should not be indefinitely held in abeyance nor thrown into confusion by the failure, beyond a reasonable time, of a public officer to qualify for the office to which he has been elected. The act under review was calculated to cure such evil and was within the province of the lawmaking power to enact. The act is not in conflict with any provision of our state Constitution.

It was urged at the oral argument of this cause that the failure of Mr. Stain to secure a bond was due to the intermeddling of others. There is no allegation of any such fact in his petition. Therefore, such question is not before us and we are not called upon to discuss the law applicable when such facts are present.

The view is expressed in the dissenting opinion that we may not in this proceeding pass upon the question of whether or not Mr. Stain has forfeited his right to the office of State Treasurer. The issues raised by the pleading in this case are not limited to the question

of whether Mr. Stain was or was not entitled to the office of State Treasurer at the time he made demand for the possession thereof. Indeed, the record is silent as to when such demand was made. So far as appears it may have been made immediately after he took his oath of office or immediately before the bringing of this proceeding. The relief sought by Mr. Stain is to be declared entitled to the office of State Treasurer. A proper determination of his present right or his right as of the time he filed his petition may not be had by a determination of whether he did or did not have such a right at some time in the past. One who seeks the aid of a court to be inducted into an office must show a present right. If the showing be that one has been entitled to the possession of an office but that such right has ceased to exist, a court may not properly lend its aid to place such a person in office. In 51 C. J., it is said, at page 315:

"Quo warranto, or a proceeding in the nature thereof, is a proper and appropriate remedy to test the right or title to an office * * *"

At page 316:

"In a proceeding wherein the relator seeks possession of the office, he may recover only upon the strength of his own title, and not upon any infirmity or weakness in the title of defendant or respondent."

And at page 319:

"Failure to qualify by filing the bond and taking the oath required is ground for ouster by quo warranto, but the rule is otherwise as to a failure to take the oath, or do some other act, within the required time, where it is done before the institution of the proceeding."

If the failure of an incumbent in office to give bond is grounds for an ouster by quo warranto, it necessarily follows that a proceeding in quo warranto may not be successfully maintained to place one in office who has forfeited his right thereto by failure to give a bond. ■ Cases are cited in the dissenting opinion where it has been held that a person who has performed the duties of an office without having given the required bond is entitled

to the emoluments thereof; that the official acts of one who is performing the duties of office without having furnished bond are valid; and that one who has assumed the duties of office by giving a defective bond or no bond should be given a reasonable time after notice to file the proper bond. Such cases do not aid Mr. Stain. He is not, and has not been, in possession of the office of State Treasurer. He has failed to give a bond within the time fixed by Second Special Session Laws of Utah 1933, c. 25.

It was urged at the oral argument that during the past certain state officers have served without a bond although there was at the time a statute requiring the giving of a bond. The record before us is silent as to the facts so claimed. We need not pause to determine whether we may take judicial notice of what is claimed in such respect because it is clear from the language of Second Special Session Laws of Utah 1933, c. 25, that the Legislature intended to prevent the State Treasurer and other public officers from hereafter serving as public officers without the required bond. By his delay in giving his official bond beyond the time fixed by the Legislature, Mr. Stain has forfeited his right to the office of State Treasurer.

It remains to be determined which of the other two parties to this controversy is the de jure State Treasurer. The solution of that question depends upon whether a vacancy may be said to have existed in the office of State Treasurer at the time the Governor appointed Mr. Hoge to that office. Obviously if no vacancy existed in the office of State Treasurer, no one could lawfully be appointed to fill such office. It will be observed that under the provisions of Second Special Session Laws of Utah 1933, c. 25, heretofore quoted, an office becomes vacant and shall be filled as provided by law whenever any duly elected or appointed person fails to qualify for such office within sixty days after the beginning of the term of office for which he was elected or appointed. It is urged on behalf of Mr. Christensen that such law is unconstiu-

tional because, by the act, the Legislature has attempted to exercise powers which are essentially judicial, and also that the Legislature has by the act attempted to reduce the term of office of State Treasurer contrary to the provisions of our state Constitution. A similar attack upon the act is urged by Mr. Stain, who also contends that the act is unconstitutional because it is class legislation and offends against article 1, § 24, and also offends against article 6, § 23, of our state Constiution, in that the act contains more than one subject. But little need be said with respect to the last two objections. This court, in a number of cases, has had occasion to discuss the rule applicable in determining whether a given legisative enactment is or is not class legislation. One of the last cases decided by this court involving that question is that of *State* v. *Packer Corporation,* 77 Utah 500, 297 P. 1013. Tested by the rule there announced, the act under review is not unconstitutional. Nor may it be said that the act is vulnerable to the claim that it contains more than one subject. *Baker* v. *Department of Registration,* 78 Utah 424, 3 P. (2d) 1082.

A more difficult question is presented with respect to the other objections urged against the validity of the act under review. It is said in 46 C. J. 973 that:

"The legislature has no power to create a vacancy in order to evade the constitution or to defeat the will of the people, and, where there is in fact no vacancy, cannot create a vacancy by declaratory enactment. The reasons for which an office will become vacant, however, may in the absence of constitutional inhibition be fixed by the legislature. Thus it may, unless so inhibited, add new causes producing vacancy in office to those already provided in the constitution. A statute declaring a vacancy in an office on the failure of one duly elected thereto to qualify, when applied to an officer not elected to succeed himself, is unconstitutional as contrary to a constitutional provision that the term shall extend until the successor shall be elected and shall qualify."

To the same effect is Mecham on Public Officers, § 387, p. 254. If the constitutional provision, article 7, § 1, under which Mr. Christensen was elected to the office of State

Treasurer, contained a provision that he should hold
office until his successor was elected and qualified,
then and in such case it would seem that the Legis-
lature was without authority to declare a vacancy, because
it is the established doctrine in this jurisdiction that when
an officer holds over under an express statutory provision
until his successor is elected or appointed and qualified.

"The right to hold over * * * is as much a part of his term of
office as the regular period prescribed by statute," and that "a fail-
ure to elect at a period fixed by the statute creates no vacancy in
the office, but imposes a right and a duty upon the incumbent to con-
tinue in office until his successor is legally elected and qualified.
* * * " *People* v. *Hardy*, 8 Utah 68, 29 P. 1118, 1119; *State* v. *Elliott*,
13 Utah 471, 45 P. 346.

Other cases where the same doctrine prevails will be
found collected in 50 L. R. A. (N. S.) at page 368, and in
74 A. L. R. 486, 487. A contrary rule obtains in other juris-
dictions. 74 A. L. R. 494. Neither our Constitution nor
statutory law expressly authorizes Mr. Christensen to hold
over until his successor is elected and qualified. Our state
Constitution contains a provision that he shall be ineligible
to election as his own successor. In the absence of any con-
stitutional or statutory provision for an incumbent in office
holding over beyond his fixed term (or until his successor
shall be chosen and shall qualify), the greater weight of
judicial authority, and what we conceive to be based on
sound principles of public policy, permits such officer to
hold over until his successor has been chosen and has quali-
fied. In some of the cases so holding, exceptions have been
made with respect to the members of the Legislature and
possibly judicial officers. Mecham on Public Officers, §
397, p. 257; Throop on Public Officers, §§ 170 and 325, pp.
182 and 326; 22 R. C. L. 554; 50 L. R. A. (N. S.) 365. The
reason for the rule is obvious. It is thus expressed in the
case of *Robb* v. *Carter*, 65 Md. 321, 4 A. 282, 283:

"The office being a trust created for the public good, it follows that
a cessation of the benefits derived from it ought not to be sanctioned
because of a failure to make an appointment by those whose duty it

is to appoint. No such failure should be permitted to cause a temporary extinction of the trust * * * for it must be borne in mind that an official is frequently the custodian of important books, papers, and other property, the care of which ought not to be abandoned, and which he cannot properly surrender to any one not legally authorized to assume control."

The important duties and responsibilities of State Treasurer are such as to require constant attention and that by some one who is legally authorized to perform such duties and assume such responsibilities. We are clearly of the opinion that it was the right and duty of Mr. Christensen to continue to perform the duties of State Treasurer until some one was legally authorized to assume and perform the duties of that office. Moreover, in the light of the fact that both Mr. Stain and Mr. Hoge are claiming the right to the office, Mr. Christensen was justified in refusing to turn the office over to either of them until it should be determined by a court of competent jurisdiction who is entitled to that office. It, however, by no means follows that Mr. Christensen is entitled to continue to hold the office of State Treasurer against the claim of Mr. Hoge. The rule which makes it the right and duty of a public officer to hold over after his term of office has expired in those cases where there is no constitutional or statutory provision for holding over is founded upon public necessity. When the public necessity ceases the rule likewise has no application. There is a vast difference between a constitutional or statutory provision which expressly provides that an incumbent shall hold over his term until his successor is elected and qualified, and a Constitution or statute which is silent upon the question of holding over. The former is the express will of the lawmaking power. The latter a judicial construction limited generally to those cases where public necessity requires such a construction. Moreover, it is clear that the purpose sought to be accomplished by the provisions of the Constitution making the State Treasurer ineligible to election to succeed himself was to

limit the term of the State Treasurer whether he holds by election or appointment. It is reasonable to assume that the framers of the Constitution were fearful that if, perchance, some irregularity should occur in the handling of state money by the treasurer during his term of office, there was danger that such irregularity might not be detected and might continue if he was permitted to continue in office for a longer period of time than one term. Such being the apparent purpose of the constitutional provision, it was competent for the lawmaking power to enact such laws as were calculated to give it effect. The danger which the framers of the Constitution apparently sought to avoid by making the State Treasurer ineligible to succeed himself would, in a measure at least, be nullified if the treasurer were permitted to indefinitely continue in office by reason of his elected successor's failure to qualify. The act of 1933 precludes the occurrence of such danger. A law calculated to give effect to the Constitution and not in conflict with its express provisions may not be said to be unconstitutional. Nor may it be said that by the act under review the Legislature attempted to exercise judicial functions. The act does not declare that a vacancy does or does not in fact exist in the office of State Treasurer. On the contrary, the act merely provides that when certain facts therein mentioned are found to exist, such facts create a vacancy. While the lawmaking power may not by declaratory enactment create a vacancy, it may within constitutional limitations add new causes which produce a vacancy. In the light of the constitutional provision making the State Treasurer ineligible to succeed himself and the clear implication to de drawn therefrom that he should not hold office for more than one term except in case of necessity, we are of the opinion that it was competent for the Legislature to enact chapters 13 and 25, Second Special Session Laws of Utah 1933. In the main, the following cases support the view that the Governor was authorized to appoint Mr. Hoge to the office of State Treasurer: *State* v. *Cocke*, 54 Tex. 482;

*State of Connecticut* v. *Clark,* 87 Conn. 537, 89 A. 172, 52 L. R. A. (N. S.) 912; *State* v. *McLure,* 84 N. C. 153; *Gosman* v. *State,* 106 Ind. 203, 6 N. E. 349; *Com. ex rel. Todd* v. *Sheatz,* 228 Pa. 301, 77 A. 547, 50 L. R. A. (N. S.) 374, 21 Ann. Cas. 54; *Etter* v. *McAfee,* 229 Pa. 315, 78 A. 275; *State ex rel. Kenner* v. *Spears* (Tenn. Ch. App.) 53 S. W. 247; *Hood* v. *Miller,* 144 Okl. 288, 291 P. 504. The distinction between an officer holding over because of a provision that he shall hold until his successor is elected and qualified, and an officer continuing to perform the duties of an office because no one is authorized to perform such duties, is pointed out in the case of *Peterson* v. *Benson,* 38 Utah 286, 112 P. 801, 32 L. R. A. (N. S.) 949, Ann. Cas. 1913B, 640.

We are thus of the opinion, and so hold, that Mr. Christensen was the de facto State Treasurer until the appointment and qualification of Mr. Hoge, and that upon the appointment and qualification of Mr. Hoge, he became the de jure State Treasurer and as such is entitled to the office. In the light of the issues raised by the pleadings and the fact that the interests of the state and its funds are involved in this controversy, we are of the opinion that each party should pay his own costs. Such is the order.

STRAUP, Chief Justice (concurring).

I concur in the result reached by the prevailing opinion. I think we all agree that where the Constitution prescribes the eligibility and qualifications to hold an office created by the Constitution, the Legislature may not enlarge nor diminish such provisions. The Constitution neither by specific nor general language as to the office of State Treasurer prescribes the giving of a bond for the faithful performance of the duties of the office or to safeguard the funds of the state as a prerequisite to hold the office. As to that the Constitution is silent. A statute, however, referred to in the prevailing opinion, requires the State Treasurer to give such a bond. True, the statute does not

say that the bond shall be given "before" or "after" the elected State Treasurer assumes the duties of the office. The statute simply provides that he "shall give to the state a surety company bond in the sum of $350,000.00," the premium of which is to be paid by the state. Now what divides us is as to whether such statutory requirement constitutes an infringement upon the constitutional provisions, especially as to an enlargement of them. I admit the matter is not free from doubt. I, however, am inclined to the view, and have reached the conclusion, that the statutory requirement to give the bond does not go to eligibility of the office and hence does not transgress the constitutional provisions of article 7, § 3, that no person shall be eligible to any of the offices therein enumerated, including the office of the State Treasurer, unless at the time of his election he shall be a qualified elector and a resident citizen of the state for five years, nor of article 4, § 10, that all officers made elective or appointive by the Constitution before entering upon the duties of their respective offices shall take and subscribe an oath to support the Constitution of the United States and of the state and to discharge the duties of the office with fidelity. I am inclined to the view that the statutory requirement to give a bond falls within the constitutional provision of article 7, § 1, that the officers therein enumerated, including the State Treasurer, "shall perform such duties as are prescribed by this Constitution and as may be prescribed by law." It seems to me more reasonable to characterize the requirement to give a bond or the giving of it as a duty prescribed by law, than as eligibility prescribed by the Constitution. I think it was competent for the Legislature in view of the constitutional provision referred to and through a proper exercise of the police power to protect and safeguard public funds and property of the state, to require the State Treasurer to give a bond and that the exercise of such a power does not violate and was not in conflict with the constitutional provision relating to eligibility. In effect, I cannot see much difference in saying that a bond may be

required of the State Treasurer when he enters upon and assumes the duties of the office and upon his failure to give the bond an action of forfeiture and ouster may be instituted, and requiring him to give a bond before he enters upon and assumes the duties of the office. Either, because of the constitutional provisions he is not required to give a bond at all to entitle him to the office and to discharge the duties thereof and to possess and become the legal custodian of the public funds of the office without bond, or that to assume and discharge such duties he is required to give a bond; and if the latter, I see no good reason why he should not be required to give the bond before entering upon and assuming the duties of the office and before he is entrusted and charged with the custody of such public funds.

It is alleged and not disputed that Stain wholly failed and neglected to furnish a bond at any time after the term of office to which he was elected began, nor after the act of the second special session of the Legislature in 1933, referred to in the prevailing opinion, took effect, declaring a vacancy in an office to which one is elected and fails to qualify within the period of sixty days. I thus am of the opinion that Stain, before he was entitled to enter upon and assume the duties of the office, was required to give a bond, unless the giving of it was waived by the state or by some one in authority prevented from the giving of it, of which no such claim or ground is alleged.

I also concur in the view that Christensen, after the four-year period of his term of office had expired and no one authorized or qualified to take charge of the office or to perform the duties thereof, was entitled to hold over and to discharge the duties of the office until his successor was elected or legally appointed and qualified to take charge of the office. And that, too, though his term of office was fixed for a period of four years without further constitutional or statutory provisions, "until his successor is duly elected and qualified," in the absence of express constitutional or statutory inhibitions forbidding the Treasurer

to hold over after the stated four years had expired. There is no such constitutional or statutory inhibition. Cases and texts generally almost with one accord are to the effect that one elected to an office for a stated period, "and until his successor is elected and qualified," is entitled to hold over as a continuation or prolongation of the term for which he was elected until some one else is legally elected and qualified to take charge of and assume the duties of the office; and until then, there is no vacancy in the office to be filled. To that effect are the prior decisions of this court referred to in the prevailing opinion. In the absence of such constitutional or statutory provision—until his successor is elected and qualified—some courts have held that one elected for a definite term or period is not entitled to hold over, though no one else is elected or qualified or legally appointed to fill the office or to take charge of it. But the weight of judicial authority is to the contrary, in the absence of an express constitutional or statutory inhibition preventing the incumbent to so hold over. The weight of judicial authority also is to the effect that the right to hold over is not affected by a constitutional or statutory provision rendering one elected to an office ineligible to succeed himself, for the reason that such a provision is held to apply only to an election or appointment and not to a holding over where no one else is elected or qualified or chosen to assume the office, and that in such case the holding over until some one else is chosen or qualified to assume the office, is but a part of and a prolongation or continuance of the term for which he was elected; and until some one else is chosen and qualified to assume the office there is no vacancy and the right of the incumbent to hold the office not defeated. *Jones* v. *Roberts County,* 27 S. D. 519, 131 N. W. 861, 34 L. R. A. (N. S.) 1170; *Carr* v. *Wilson,* 32 W. Va. 419, 9 S. E. 31, 3 L. R. A. 64; *State ex rel. Pluntz* v. *Johnson,* 176 Wis. 107, 184 N. W. 683, 186 N. W. 729; *Pruitt* v. *Squires,* 64 Kan. 855, 68 P. 643; *People ex rel. Parsons* v. *Edwards,* 93 Cal. 153, 28 P. 831; *People ex rel. Stratton* v. *Oulton,* 28 Cal. 44; *Robb* v.

*Carter,* 65 Md. 321, 4 A. 282, 286; Mechem, Public Officers, § 397; Throop, Public Officers, § 170; note 50 L. R. A. (N. S.) 365.

Thus, in such view and until some one else was elected or chosen and qualified to assume the office and take charge of it, Christensen was not only the de facto but also the de jure officer. Until then there was no one else either de jure or de facto to assume or take charge of the office. Thus the defeasibility of his right to hold the office, in my opinion, must rest upon the act of chapter 25 of the Second Special Session of the Legislature of 1933, referred to in the prevailing opinion.

It is urged by counsel for Stain that the act was "directed towards Stain" and was passed "to deny him his seat." It may be that the adoption of the act was prompted because of the failure or inability of Stain to furnish the required bond, and that legislation on the subject was thought necessary to legally appoint another to take charge of an office to which one was elected and failed to properly qualify to assume the duties of the office. But the act does not apply alone to Stain. It applies to all elected or appointed officers enumerated in the statute and similarly situated. I find statutes of other states to the effect that where one is elected to an office and within a stated time or period fails or refuses to qualify to enter upon the duties of the office, "such office shall be deemed vacant and shall be filled" by appointment as by law provided. *Hood* v. *Miller,* 144 Okl. 288, 291 P. 504, 506; *Re Executive Communication,* 25 Fla. 426, 5 So. 613; *State ex rel. Sneed* v. *Bullock,* 80 N. C. 132; *Davidson* v. *Brice,* 91 Md. 681, 48 A. 52; *Adams* v. *Doyle,* 139 Cal. 678, 73 P. 582.

I have not found where any of such acts have been held unconstitutional. I thus think it was competent for the Legislature to declare that when one duly elected or appointed to an office of the state, etc., fails to qualify for such office within sixty days after the date of the beginning

of the term of office for which he was elected, the office may be declared vacant and the vacancy filled by appointment as by law provided.

There of course is a question as to whether the act so declaring a vacancy applies to a situation similar to that of Stain, where one so elected to an office the term of which began more than eight months before the act was passed and approved and ten months before it took effect and where such person had not assumed the duties of the office. The term of office to which Stain was elected began January 2, 1933. It is argued that to give the act effect to officers elected prior to the approval and taking effect of the act is to give it retroactive operation. The second special session of the Legislature was convened July 10, 1933, chiefly to enact legislation to provide revenue for the support of the government of the state, and to consider other matters which the Governor might bring to the attention of the Legislature in such session. The act in question in terms applies to all persons duly elected or appointed to an office of the state, etc., and who fail to qualify for such office within sixty days after the date of the beginning of the term of office. When Stain was elected and when his term of office began, the statute requiring the giving of a bond was in full force and effect. But the statute did not provide within what time, after the term of office began, the bond was required to be given. Chapters 13 and 25 of the Second Special Session of 1933 when read together, as I think they should be, require the giving of a bond within sixty days after the term of office begins. At any rate, that is the interpretation which I think should be given such sections. Hence, what in such respect was unsettled as to time in which such bond was to be given was fixed and settled by the enactment of the special session of the Legislature referred to. In doing so, no vested right nor obligation of a contract was divested or impaired nor any new obligation or duty created or imposed. The enactment merely fixed a time when the bond was required to be given,

the giving of which, as I view the case, was by law required and in force when Stain was elected and before he could legally assume the duties of the office. Says the author in 6 R. C. L. 305, that:

"While it is recognized that the legislature cannot in general establish a rule to operate retrospectively, when, however, a rule of the law is unsettled, the legislature may settle it, and such a rule necessarily operates both prospectively and retrospectively."

We have a constitutional provision, article 1, § 18, that no bill of attainder or ex post facto law, or law impairing the obligation of contracts, shall be passed. We have no constitutional provision as found in Constitutions of some states forbidding not only ex post facto laws but also retrospective laws or giving retroactive operation or effect to a statute. There is a difference between an ex post facto law and a mere retrospective law. Of course, both are retrospective in operation but all retroactive laws are not ex post facto laws. 6 R. C. L. § 290, p. 303; 12 C. J. 1084. I am not holding that a statute, however characterized, may be given retrospective operation, when by giving it such effect will divest or impair vested rights or obligations of a contract or impose new obligations, etc. What I say is that the application of the statute in question to the matter in hand does not do that.

I think it was the legislative thought or understanding that where one elected to an office enumerated in the act and failed to qualify, the incumbent was entitled to hold over, and until such elected officer qualified there was no vacancy to be filled by appointment. And I think the weight of judicial authority seems to support that. Hence, the Legislature required an elective officer to qualify within sixty days after the term of office to which he was elected began and upon his failure to do so, a vacancy in the office by legislative enactment resulted authorizing it to be filled by appointment. As heretofore stated, I think it was competent for the Legislature to do so. And from a reading of

the act it would seem that so as not to give retrospective operation to the statute to one similary situated as was Stain, the act, in effect, provided that one elected to office prior to the adoption of the act and who had failed to qualify was given fifty-four days from the date the act was approved and until it took effect and forty days thereafter to qualify. Stain not having qualified, the Governor, one hundred and twenty-five days after the act was approved and seventy days after it took effect, made the appointment filling the vacancy. In other words, had Stain qualified at any time after the act was approved and took effect before the appointment was made, I think it may well be assumed no appointment to fill the vacancy would have been made, though Stain had not qualified within the sixty-day period after the act took effect, for that no appointment was made until seventy days after the act did take effect.

I thus concur in the result reached by the prevailing opinion that Hoge, when appointed and qualified and demanded Christensen to surrender the office to him, was entitled to assume and take charge of the office; and until then Christensen was the de jure officer, and thereafter he in good faith and under claims of right exercising and discharging the duties of the office and pending the disputed claims and rights to the office preserving the interests of the state, was the de facto officer, until a determination by this court with respect to such disputed claims and rights, and all his official acts in discharge of the duties of the office valid and binding.

FOLLAND, Justice.

I concur in the opinion of Mr. Justice ELIAS HANSEN and also in the opinion of Mr. Chief Justice STRAUP.

EPHRAIM HANSON, Justice.

I concur in the views expressed in the opinion of Mr. Chief Justice STRAUP.

MOFFAT, Justice (dissenting).

I dissent. From the title of this case it would appear to be the usual case of plaintiff against two defendants. The issues, however, are more complicated. It is a triangular case. Though not of the nature or character of the "Eternal Triangle," the problems are as complicated and in certain aspects quite as perplexing, although the facts are not in dispute. I hesitate to express my disagreement with the conclusion reached by my brethren of the court. As to who may perform the duties of the office of State Treasurer is of no serious moment. The legislative and constitutional implications, however compel an expression upon the issues involved, and duty requires it.

Where it may be necessary to refer to the respective parties, reference will be made to them by name rather than by plaintiff and defendant. Such reference seems necessary, as each one is for himself and neither gets aid nor comfort nor consolidation nor support from the other.

The facts are: That A. Edsel Christensen was elected State Treasurer at the general election of 1928. He took the oath of office and filed a bond as required by the statute and assumed the duties of the office on the first Monday in January, 1929, and from that time he has continued to act as State Treasurer. The voters of the state at the general election of 1932 elected Mr. Stain State Treasurer. He took oath of office on the first Monday of January, 1933, and thereupon made demand upon Mr. Christensen for the office. At that time and up to the time of instituting this proceeding he had not filed an official bond.

On December 12, 1933, the Governor, in pursuance of certain acts of the second 1933 special session of the Legislature, appointed Enos Hoge State Treasurer. Mr. Hoge took the constitutional oath of office and on January 4, 1934, filed a bond with the proper officers.

Mr. Hoge's position is that Mr. Stain has forfeited his right to the office because of his failure to give a bond; that

the term for which Mr. Christensen was elected expired in January, 1933; that Mr. Christensen could not hold over, and that a vacancy existed in the office of State Treasurer; that the Governor having appointed him to fill that vacancy, and having taken his official oath and filed his official bond, he is entitled to the office. Mr. Hoge's right to the office, if any he has, depends, as asserted by him, first, upon whether there was a vacancy in the office of State Treasurer at the time of his appointment; and, secondly, upon the constitutionality of certain laws passed by the second special session of the Legislature of 1933.

I shall discuss Mr. Stain's position first. Mr. Stain raises important questions of law. The relative importance of the problems suggests that they be analyzed and answered in the order following:

Must the State Treasurer, elect, file a bond as a *prerequisite or condition precedent* to his assuming the duties of his office? If that question be answered in the negative, there would seem to be no necessity for further discussion of the subject, as Mr. Stain is entitled to the office, and it should have been turned over to him upon his demand after taking the oath. However, the answer to that question will be found in the answer to either one of the following questions:

(1) Having in mind the provisions of the Constitution of the State of Utah, has the Legislature the power to pass a law, imposing, *as a prerequisite or as a condition precedent,* the filing of a bond *before* the State Treasurer may assume or enter upon the duties of his office? And,

(2) Assuming that the Legislature has the power or authority so to do, and thereby answering the last preceding question in the affirmative, *has* the Legislature prescribed that *"previous to"* or *"before entering upon the duties of his office"* he shall give a bond?

If questions numbered (1) and (2) are answered in the negative, then a third question is suggested:

(3) Accordingly, assume that question (1) is answered in the negative, may the Legislature, notwithstanding, require a bond as one of the *duties* of the office after he has qualified as State Treasurer by taking the constitutional oath, as an assurance that he will according to law receive, diligently care for, and fully, faithfully, and completely account for all property or funds belonging to the state, or in which the state has any interest, that may be intrusted to him, or, in general terms, that he will *perform all the duties* of the office of State Treasurer? And,

(4) A law having been passed requiring that "the State Treasurer must execute an official bond in the sum of $350,000.00," is the failure to "execute" and "file" such a bond a ground for depriving him of the right to assume the duties of the office of State Treasurer? Or,

(5) Such bond being for the benefit of the state and for the security of its funds, and an assurance of performance of the duties of the office, is such failure a ground for forfeiture, only, of the office on the part of the state? And in the absence of objection on the part of the state in the form of an action instituted for such forfeiture, is the filing of a bond deemed waived by the state?

Regardless of what may be said to the contrary, this is not a proceeding for the forfeiture of an office. One may not forfeit what he has never had, nor be required to, never having been permitted either to perform or violate a duty of an office, a right to assume or perform a duty may not in this action be forfeited. This is a suit, private in its nature, between three parties each claiming the office on grounds other than that of forfeiture. It is an action in quo warranto to determine who is entitled to take or to hold the office on the grounds stated, and the question of forfeiture may not be raised by the parties hereto nor be determined by the court in this action. In so far as Mr. Stain's rights to the office are concerned they were fixed, and he has the right to have them determined as of the hour he

demanded the office from his predecessor, and his demand was refused.

A question, only incidental in character suggests itself. The statute requires the State Treasurer to execute a bond in the sum of $350,000. That is his official bond as State Treasurer. As custodian of the state insurance fund, an addditional bond of $150,000 is provided for. May he be required to file both bonds before assuming the duties of the office of State Treasurer or, after assuming the duties of the office of State Treasurer, may he be required to furnish the state insurance fund bond as a condition or right to hold the office of State Treasurer? Otherwise stated, is a failure to furnish the "State Insurance Fund Bond" a ground either for depriving a treasurer elect of his office, or for forfeiture after assuming the duties of the office?

Approaching the first question:

"Having in mind the provisions of the Constitution of the State of Utah, has the State Legislature the power to pass a law *imposing as a prerequisite* or *as a condition precedent,* the filing of a bond, *before* the State Treasurer *may assume* or *enter upon the duties* of his office?"

An examination of the provisions of the state Constitution becomes imperative. Article 24, § 16, is cited and discussed. It reads:

"The provisions of this Constitution shall be in force from the day on which the President of the United States shall issue his proclamation, declaring the State of Utah admitted into the Union; and the terms of all officers elected at the first election under the provisions of this Constitution, shall commence on the first Monday, next succeeding the issue of said proclamation. Their terms of office shall expire when their successors are elected and qualified under this Constitution."

The President's proclamation was issued on the 4th day of January, 1896, so the term of the first officers began on that date, and under the provisions of article 7, § 1, Constitution of Utah, the term of office of the first officers of the executive department, viz., Governor, Secretary of State,

State Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction, were definitely ended "on the first Monday in January, A. D. 1901." The term of office of all of said officers was definitely fixed at four years, with no provision for their holding over until the election or qualification of a successor. It is manifest that article 24, § 16, Constitution of Utah, supra, was a special and temporary provision relating solely to the date the Constitution should become effective and the term of the first officers. The provisions of article 24, § 16, supra, were temporary in their character. The purposes of that section have been accomplished; the force and operation of them have been spent.

The question of the terms and bonds of the first executive state officers having been referred to in briefs and oral argument, this is probably as appropriate a place as any to refer to that matter presented on behalf of Mr. Stain in so far as it relates to a matter of record and interpretation of the first officers of the state of Utah. It is a matter of what the record fails to disclose, rather than what it does disclose; otherwise the disclosures are negative, or wanting, and quite like the disclosures of the state Constitution relating to the filing of a bond by state officers.

Under the law at the time the Constitution of Utah became effective, January 4, 1896, the office of the Secretary of State was the depositary and office of record of all official bonds. In so far as either the deposit or record of any bond relating to the qualification of the first executive officers is concerned no bond was executed, filed, or recorded at the time of assuming office by the first state officers.

Laws of Utah 1896, c. 53, p. 143, provided:

"The State Treasurer must execute an official bond in the sum of three hundred and fifty thousand dollars."

(We shall have occasion to refer to this statute again.)

In so far as the records or files disclose, the first State Treasurer never complied therewith. Similar provisions

were passed by the first session of the State Legislature as to the bonds of other executive state officers, fixing the bond of Secretary of State at $10,000 (p. 174) ; Attorney General at $5,000 (p. 124) ; State Auditor $50,000; Superintendent of Public Intruction, $5,000 (p. 470). A check of the record from 1896 to 1915 fails to disclose "any record of a bond for Hon. J. T. Hammond, Secretary of State; Hon. Morgan Richards, State Auditor, or Hon. James Chipman, State Treasurer, covering their particular offices to which they were elected in November, 1895." The record further discloses that a personal bond was filed by Hon. James Chipman, State Treasurer, on June 15, 1896, in the sum of $200,000 as provided in an act of April 2, 1896, entitled "An Act creating a State Board of Land Commissioners," etc., which is listed as an additional bond. The Superintendent of Public Instruction filed a bond in the amount of $5,000 dated December 7, 1897, and Hon. A. C. Bishop, Attorney General, on May 20, 1896, filed a bond in the sum of $5,000. "All State officials elected November 5, 1895 subscribed the official oath on January 6, 1896," as revealed by the record. Neither the Governor, chief of the executive department, nor any judicial officers, nor any officers of the legislative department of the state government, have ever been required by statute to give a bond, either before or after assuming the duties of the respective offices, and no statute between 1898 and 1905 existed, requiring the Secretary of State to file any bond. Numerous state officers have qualified and served and still qualify and serve without filing a bond. In so far as any provision in the Constitution is concerned, there is no distinction. Relating to the officers of the executive department, it is provided by article 7, § 1, as follows:

"The Executive Department shall consist of Governor, Secretary of State, State Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction, each of whom shall hold his office for four years, beginning on the first Monday of January next after his election, except that the terms of office of those elected at the first election shall begin when the State shall be admitted into

the Union, and shall end on the first Monday in January, A. D. 1901. The officers of the Executive Department, during their terms of office, shall reside at the seat of government, where they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this Constitution and as may be prescribed by law."

That the first executive officers, upon their election and taking of the oath, were by the express terms of the Constitution entitled to hold office until "the first Monday in January, 1901," without bond if they chose to do so. If the filing of a bond is a duty of an office and arises only after assuming the duties of an office and thereafter is subject to legislative control as provided in the Constitution vesting in the Legislature power to prescribe the duties of an office, the provisions of article 7, § 1, supra, could not affect "the terms of office of those elected at the first election" whose term "shall begin when the state shall be admitted into the Union, and shall end on the first Monday in January, A. D. 1901." That such may have been the position of the first officers may account for their behavior in not filing any bonds at the time they assumed office, or, in certain instances, not at all.

It may be noted that the above section provides, after naming the officers, that "each of whom shall hold his office for four years." There is no provision for holding until a successor is elected and qualified. By that provision of the Constitution the term is fixed and limited to four years. If the officer holding the office at the time of an election of a successor holds beyond the four-year term prescribed, authority to do so must be found otherwise than in section 1 of article 7, supra.

Attention is directed also to the last sentence of section 1, art. 7, supra, and particularly the last clause thereof, "They (the Executive officers) shall perform such duties as are prescribed by this Constitution and as may be prescribed by law." It is clear that there are certain *duties* prescribed by the Constitution and that the framers of the Constitution

had in mind that other *duties* besides those prescribed by
the Constitution might be prescribed by the Legislature. The
filing of bond is not one of the constitutional duties pre-
scribed before one may enter upon the duties of an office.
If the execution and filing of an official bond is a duty of
the office, then the Legislature would have, by this provision
of the Constitution, express power to require the execution
of a bond as such duty. If the filing of an official bond is
not a duty of an office, the Legislature is, upon such assump-
tion, not empowered to exact it. Any other interpretation
or construction forces a paradox. The difficulty is en-
countered in attempting to answer the question:

"How may anyone perform or be required to perform a prescribed
duty of an office until he assumes the duties of the office,—becomes
a qualified officer?

Prerequisits to entering upon the duties of an office are
different from performance of the duties of the office after
the prerequisites have been complied with. The Constitu-
tion has prescribed what the prerequisites are. The ele-
ments of eligibility, or qualification to hold a constitutional,
as distinguished from a statutory, office in the state of Utah,
are found in the Constitution itself. Under such circum-
stances may the Legislature add to or prescribe additional
prerequisites, or eligibility qualifications, before a duly
elected officer may assume the duties of the office to which
he has been by the conceded necessary vote of the people
elected, and after having taken the prescribed official oath
of office.

### Section 2 of article 7, provides:

"The officers provided for in section one of this article shall be
elected by the qualified electors of the State at the time and place of
voting for members of the Legislature, and the persons respectively
having the highest number of votes cast for the office voted for shall
be elected; but if two or more shall have an equal and the highest
number of votes for any one of said offices, the two houses of the
Legislature, at its next regular session, shall elect forthwith by joint
ballot one of such persons for said office."

This section provides with certainty that the will of the majority shall bring about a choice of persons to fill the constitutional offices. It also takes care with certainty, and provides the procedure, in the event the electors fail because of a tie vote to bring about an expression of a choice as determined by the number of votes. There is nothing in the section relating to qualifications, eligibility, or holding over the prescribed term of four years, unless it may be implied that an officer will hold over until both Houses of the Legislature elect, which would be accomplished promptly, as the Legislature is required to meet just one week following the date of assuming office by the other state officers, and thereupon is required to elect *"forthwith."*

Article 7, § 3, of the Constitution deals with eligibility as follows:

"No person shall be eligible to the office of Governor or Secretary of State unless he shall have attained to the age of thirty years at the time of his election, nor to the office of Attorney-General unless he shall have attained the age of twenty-five years * * * and have been admitted to practice in the Supreme Court of the Territory or State of Utah, nor unless he shall be in good standing at the bar at the time of his election. No person shall be eligible to any of the offices provided for in section one of this article, unless at the time of his election he shall be a qualified elector, and shall have been a resident citizen of the State or Territory for five years next preceding his election. The State Auditor and State Treasurer shall be ineligible to election as their own successors."

A discussion of the definition of words is often a profitless consumption of time, and yet as stated in section 27 of article 1 of the Constitution of Utah, "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." This admonition of the framers of our Constitution carries more than ordinary weight when constitutional interpretations are involved that affect fundamental operating governmental processes, and especially as related to an expression of the qualified electorate of the state upon a matter of the selection of a legally qualified, and in so far as the record

in this case discloses, a capable, competent, and honorable person to serve the people. When a person has been duly, by regular procedure, selected, and by the legally prescribed and necessary number of votes of the qualified electors of the state elected to a position, certain presumptions maintain. In the absence of direct attack, he is presumed to be worthy of trust, capable of performing the duties, competent and eligible, at least until attacked upon those grounds. No attack is here made on the matter of eligibility in so far as the right of the people to vote for and elect, or, of the proper authority, to appoint any of the parties hereto to the position of State Treasurer in any of the senses in which the words "eligibility" and "qualification" are used as to matters of election, nor that any one of the parties to this proceeding stands on any different ground than the others on matters of personal qualifications, or abilities to perform or have performed the duties of the office. A difficulty that so often arises is that some words are used with varying and different meanings. Sometimes the meaning to be applied is a general and commonly understood meaning; sometimes the meaning is controlled by the context; other times all of these factors must be considered. Sometimes there is an absence of any statement, and implications only are available.

As to the words "eligible," "qualified," or "qualifications," we find in the Constitution of Utah such expressions as:

"No person shall be deemed a *qualified elector* of this State unless such person be a citizen of the United States." (Italics added.) Const. Utah, art. 4, § 5.

What constitutes a "qualified elector," as referred to in section 5, supra, is defined in section 2 of the same article as being:

"Every citizen of the United States, of the age of twenty-one years and upwards, who shall have been a citizen for ninety days, and shall have resided in the State or Territory one year, in the county four months, and in the precinct sixty days next preceding any election,

shall be entitled to vote at such election except as herein otherwise provided."

Thus, a "qualified elector," and a "qualified voter," would as there referred to seem to be synonymous. Then we find such uses as:

"No property *qualification* shall be required" (Const. art. 4, § 7); "*qualified* electors" (article 6, §§ 3, 4); "no person shall be *eligible* to the office of senator or representative, who is not * * * a *qualified* voter" (article 6, § 5); "each house shall be the judge of the election and *qualifications* of its members" (article 6, § 10); "the officers * * * shall be elected by the *qualified* electors" (article 7, § 2); "no person shall be *eligible* * * * unless * * * a *qualified elector. * * * The State Auditor and State Treasurer shall be *ineligible* to election as their own successors" (article 7, § 3).

"When any State or district office shall become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the Governor shall have the power to fill the same by granting a commission, which shall expire at the next election, and upon *qualification* of the person elected to such office." Const. art 7, § 9. "If the office of justice of the supreme or district court, Secretary of the State, State Auditor, State Treasurer, Attorney-General or Superinendent of Public Instruction be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and *qualified*, as may be by law provided." Const. art. 7, § 10. "Governor shall not be *eligible* for election to the Senate of the United States during the term for which he shall have been elected Governor." Const. art. 7, § 23. "The term of office of the District Judges shall be four years. Except that the District Judges elected at the first election shall serve until the first Monday in January, A. D. 1901, and until their successors shall have *qualified*." Article 8, § 5. "A County Attorney shall be elected by the *qualified* voters of each county." Const. art. 8, § 10. For the expression "*qualified* electors," see article 11, §§ 2, 5; art. 14, §§ 3, 7; art. 24, § 14). "No officer * * * of any corporation * * * shall be eligible," etc. Article 12, § 17. "The making of profit out of public monies, or using the same for any purpose not authorized by law, by any public officer, shall be deemed a felony, and shall be punished as provided by law, but part of such punshiment shall be *disqualification* to hold public office." Article 13, § 8. "The provisions of this Constitution shall be in force from the day on which the President of the United States shall issue his proclamation, declaring the State of

Utah admitted into the Union; and the terms of all officers elected at the first election under the provisions of this Constitution, shall commence on the first Monday, next succeeding the issue of said proclamation. Their terms of office shall expire when their successors are *elected* and *qualified.*" *Const. art.* 24, § 16. (Italics added.)

The above references to the state Constitution and a reference to a case heretofore decided by this court manifest the futility of attempting to determine whether or not the framers of the Constitution intended, by the use of the words "eligible" or "qualified" in their various forms, that a bond should be required as a condition precedent to the assuming of the duties of the office. The words "eligible" and "qualify" were discussed and distinguished and given the meaning required by the context with which they were used in the case of *State by Barnes, Attorney General, ex Inf. Korns* v. *Shores*, 48 Utah 76, 157 P. 225, 226. The defendant Shores had been appointed by the board of commissioners of Salt Lake City to the office of chief of police and had entered upon the duties of the office. At the time of the appointment and assumption of the duties of the office it was admitted that if a section of the statute first hereinafter quoted was in force that defendant was not "eligible," because not a "qualified elector," for the reason of failure of residential requirements. A section of the statute (section 221, Comp. Laws Utah 1907) provided:

"No person shall be *eligible* to any office who is not a *qualified* elector of the city."

Under another statute, section 10, ch. 28, Laws of Utah 1899, it was provided:

"The city council shall have the power by ordinance to prescribe and define the *qualifications* and duties of the officers and employees of said departments," referring to the police and fire departments. (Italics added.)

The contention of the defendant Shores was that section 221 was expressly or by necessary implication repealed. The 1899 law being a subsequent act of the Legislature, there

being no express repeal of section 221, the question was whether there had been a repeal by implication. The court held that there being no irreconcilable conflict, the former section was not repealed and then proceeded to discuss the words "eligible" and "qualifications" and among other things said: "There is a clear distinction between 'eligible,' as used in section 221, and 'qualifications,' as used in the Laws of 1899." Had we such a distinction in the use of the two words in the Constitution, and did that distinction bear upon the steps to be taken after the election or eligibility qualifications were satisfied, or had we a contextual definition indicating what steps should be taken either expressly stated or by necessary implication indicated, a discussion of the problem before us might have been obviated. We are not so favored. The Constitution has provided affirmatively on the score of eligibility, and negatively on that of ineligibility that no person shall be eligible unless at the time of election he shall be a qualified elector, a resident citizen of the state for five years. No age limit is fixed as to State Treasurer, State Auditor, or Superintendent of Public Instruction, or other limitation than that of being a qualified elector, citizen of the United States, and not under the disabilities otherwise provided in the Constitution. It may be significant to note that an age eligibility is fixed for every other state constitutional office, viz.: Governor, thirty years; Attorney General, twenty-five years; Secretary of State, thirty years; Justices of the Supreme Court, thirty years; judges of district courts, twenty-five years. Giving due consideration to the various uses and meanings of "eligibility," "qualification," or "assurance," as these words are used in the Constitution or elsewhere, does not materially aid in whether or not the filing of a bond is required before assuming official duties. The Constitution of Utah has provided what steps must be taken. Eligibility, as such, is conceded on the part of all the parties hereto in so far as constitutionally defined or inhibited. Eligibility is likewise conceded in so far as legal or personal qualifications are

concerned and none of them are ineligible. None of them are subject to any disabilities provided by the Constitution except the incumbent State Treasurer is "ineligible to election as his own successor."

How stands the matter? The only question for consideration in so far as those matters are concerned is: Have all the required constitutional steps been taken as to election and qualification?

After having received the required number of votes, the only other requirement of state officers provided for by the Constitution is that they, "before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: 'I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this State, and that I will discharge the duties of my office with fidelity.' "

Our state Constitution contains no express provisions relative to the giving of a bond by the State Treasurer or any other state officer, nor have we been able to find any language from which such requirement could logically or reasonably be inferred; neither does it expressly authorize the lawmaking power of the state to require the giving of a bond by any of such officers, nor are there expressly laid any inhibitions in the Constitution denying the right or power to make the filing of a bond a condition precedent to the assuming of the duties of a state office after his election. The Constitution is silent upon that matter. There are no provisions for construction. There being no such requirement and no such inhibition, is it competent for the Legislature to add to the requirements contained in the Constitution as a *condition precedent* to his right to assume the duties and enjoy the emoluments of the office of State Treasurer?

Eminent authority, sound reasoning, and, I think, the great weight of authority supports the doctrine that when a Constitution speaks upon the question of eligibility or qualification for an office, its declarations are conclusive of

the whole matter whether the language used is affirmative or negative in form.

There are a few jurisdictions in which it is held that when the constitutional provisions are negative the Legislature is at liberty to add to or restrict the right to hold office. So far as our search has disclosed, those states so holding are decidedly in the minority.

The West Virginia Constitution (art. 4, § 4) provides that:

"No person, except citizens entitled to vote, shall be elected or appointed to any State, county or municipal office."

The West Virginia court held that to say that such provision was equivalent to saying "that all electors are duly qualified to hold office" was fallacious. *State ex rel. Thompson* v. *McAllister,* 38 W. Va. 485, 18 S. E. 770, 771, 24 L. R. A. 343.

An Ohio case contains the following: The Ohio Constitution (art. 15, § 4) declares:

"No person shall be elected or appointed to any office in this state unless he possesses the qualification of an elector."

A legislative enactment provides:

"Each member and officer of the police force shall be a citizen of the United States, and a resident citizen, for three years, of the city in which he shall be appointed, and able to read and write the English language."

The court says:

"Now, unless the clear implication is that every person who has the qualifications of an elector shall be eligible to any office in this state, there is no conflict between the statute and the constitution." *State of Ohio ex rel. Attorney General* v. *Covington et al.,* 29 Ohio St. 102.

I confess I fail to appreciate the force or logic of the reasoning. Suppose the provision should read: "No person except a taxpayer shall be eligible to hold office." Such

provision is clearly equivalent to a provision that all tax-payers shall be eligible to hold office. There would seem to be greater reason for holding that an affirmative declaration was subject to further legislative limitation than the negative declaration. Had the question been presented as to a constitutional office rather than a statutory one, it might be questioned whether the same conclusion would have been reached.

The Constitution of Kansas (Art. 6, § 1), relating to county superintendents of public instruction, provided:

"A superintendent of public instruction shall be elected in each county, whose term of office shall be two years, and whose duties and compensation shall be prescribed by law."

A statute was passed (Rev. St. 72—202) providing:

"That a person to be eligible to the office of county superintendent of public instruction must hold a first-grade certificate, or a state certificate, or be a graduate of an accredited college or normal school, and must have taught at least eighteen months."

The question arose as to the power of the Legislature to impose eligibility qualifications other than those imposed by the Constitution. The Kansas court said:

"It is the rule that, when the Constitution of a state creates an office, and names the requirements of eligibility therefor, the Legislature has no authority to make additional requirements, nor to provide that one may hold the office who does not have the constitutional requirements. When an office is created by an act of the Legislature, that body has authority to name the terms of eligibility and modify them at will." *Jansky* v. *Baldwin* 120 Kan. 332, 243 P. 302, 303, 47 A. L. R. 476.

It will be noted that the above provision of the Kansas Constitution discusses but one matter relating to the office of superintendent of public instruction, and that is as to the length of the term of office. The court then says:

"Our Constitution, article 5, §§ 2, 5, and 6, has placed certain restrictions upon the right of suffrage and the right to hold office. So long as a legislative act does not infringe upon these restrictions, it cannot be said to be unconstitutional. * * * The Constitution,

although it provided such office, did not deal with the subject of the specific fitness of the person who should be elected to such office, leaving that to the Legislature to be fixed and modified as educational needs might require." *Jansky* v. *Baldwin*, 120 Kan. 332, 243 P. 302, 303, 47 A. L. R. 476.

The Supreme Court of Colorado also takes what is generally referred to as the "minority view." In the case of *Darrow* v. *People ex rel. Norris*, 8 Colo. 417, 8 P. 661, 663, the complaint charged the respondent wrongfully and unlawfully usurped and intruded on the office of alderman of the city of Denver, that at the time of his election and induction into office he was disqualified from holding that position, by reason of his having paid no taxes in the city during the year previous. A statute had been passed requiring in certain cities, "the payment of taxes as a necessary qualification for membership of the board of aldermen." The Colorado Constitution (art. 7, § 6) provided:

"No person except a qualified elector shall be elected or appointed to any civil or military office in the state."

As to the situation the court said:

"There is nothing in the constitution which expressly designates the qualifications of councilmen in a city or town, and this section contains the only language that can possibly be construed as applicable thereto. But it will be observed that the language used is negative in form; that it simply prohibits the election or appointment to office of one *not* a qualified elector. There is no conflict between it and the statute. By providing that a supervisor or an alderman shall be a taxpayer, the legislature does not declare that he need not be an elector. Nor is the provision at all unreasonable; on the contrary it is a safeguard of the highest importance to property owners within the corporation. The right to vote and the right to hold office must not be confused. Citizenship, and the requisite sex, age, and residence, constitute the individual a legal voter; but other qualifications are absolutely essential to the efficient performance of the duties connected with almost every office. And, certainly, no doubtful implication should be favored for the purpose of denying the right to demand such additional qualifications as the nature of the particular office may reasonably require. We do not believe that the framers of the constitution, by this provision, intended to say that

the right to vote should be the sole and exclusive test of the eligibility to all civil offices, except as otherwise provided in the instrument itself; that no additional qualifications should ever be demanded, and no other qualifications should be imposed. If, as has been well said, they 'had intended to take away from the legislature the power to name disqualifications for office, other than the one named in the constitution, it would not have been left to the very doubtful implication which is claimed from the provision under consideration.' "

For the position taken the Colorado court cites *State* v. *Covington,* 29 Ohio St. 102, supra.

The four foregoing cases represent the arguments for the construction placed upon the constitutional provisions stated negatively. The negative argument proceeds upon the premise that if the provision is stated negatively that to make the provision applicable to or the equivalent of a positive statement, applicable to anything but the negative, that resort must be had to implication. The argument would seem to lead to the necessity of distinguishing between the effect of such statements as: "All the 'A's' shall be permitted to vote," and "none except the 'A's' shall be permitted to vote."

The following cases and texts take a different view. A short synopsis of part of them will furnish sufficient to establish a comparison as to the soundness of the position and the weight of authority. Stating both situations, Corpus Juris says:

"A provision that a person not an elector shall not be elected or appointed to an office does not preclude the legislature from requiring qualifications for an office additional to those required of an elector."

The cases heretofore referred to seem to constitute all the authority for the Corpus Juris text. Following the above statement and as a part of the same paragraph, there follows:

"On the other hand, where the Constitution provides that all electors shall be eligible to office, the legislature cannot impose additional qualifications," and, "Where the Constitution has defined the qualifications for an officer, it is not within the power of the Legislature

to change them or add new or additional qualifications, unless the Constitution confers that power." 46 C. J. 937, § 32.

In the case of *People* v. *McCormick*, 261 Ill. 413, 103 N. E. 1053, 1056, Ann. Cas. 1915A, 338, the only controversy was as to that of eligibility. The appellee had resided in Illinois more than one year and less than five years immediately preceding his election. The Constitution of Illinois (art. 6, § 17) provided that: "No person shall be eligible * * * to membership in the 'board of county commissioners,'" unless he shall be at least twenty-five years of age, and a cititzen of the United States, nor unless he shall have resided in the state five years next preceding his election. The court, after analyzing this and other provisions of the Illinois Constitution, held that the provision applied only to those counties that had not brought themselves under the "township Government," as provided in the Constitution, and that at the time of the adoption of the provision, Cook county was under "township Government" and that the limitation of five years did not apply, indicating that section 7 of article 10 of the Constitution, as follows, took Cook county out of the general provision: "The county affairs of Cook county shall be managed by a board of commissioners of fifteen persons," etc. The court then proceeded to say:

"All persons are equally eligible to office who are not excluded by some constitutional or legal disqualification. Eligibility does not even depend upon the right of suffrage, for persons not electors may be appointed or elected to various offices. * * *

"*Where the Constitution declares the qualifications for office, it is not within the power* of the Legislature to change or add to them, unless the Constitution gives that power. 'It would seem but fair reasoning, upon the plainest principles of interpretation, that when the Constitution established certain qualifications as necessary for office it meant to exclude all others as prerequisites. From the very nature of such a provision the affirmance of these qualifications would seem to imply a negative of all others. * * * A power to add new qualifications is certainly equivalent to the power to vary them.' 1 Story on the Constitution, § 625. * * *

"There is a distinction between offices created by the Constitution and those created by statute. Where an office is created by statute,

it is wholly within the power of the Legislature creating it. The length of term and mode of appointment may be altered at pleasure, and the office may be abolished altogether. *People* v. *Loeffler*, 175 Ill. 585, 51 N. E. 785; *People* v. *Olson*, 245 Ill. 288, 92 N. E. 157. It is not so of constitutional offices."

The case of *Wachter* v. *McEvoy*, 125 Md. 399, 93 A. 987, 989, contains the following significant statement:

"The provision that a police commissioner was eligible to an office whose qualifications were prescribed by the Constitution was unnecessary, as it was not within the power of the Legislature, where the Constitution had defined the qualification of an officer, to change or superadd new or additional qualifications."

At the time the case of *Hoffman* v. *Downs*, 145 Minn. 465, 177 N. W. 669, was decided, section 811, G. S. Minnesota 1913, provided:

"A county auditor shall be elected in each county, who shall hold his office for the term of four years from the first Monday of January next succeeding his election, and until his successor qualifies; but no county commissioner, county surveyor, or county treasurer shall be eligible to such office."

However, the Constitution of Minnesota, art. 7, § 7, contained the following provision:

"Every person who by the provisions of this article shall be entitled to vote at any election shall be eligible to any office which now is, or hereafter shall be, elective by the people in the district wherein he shall have resided thirty days previous to such election, except as otherwise provided in this constitution, or the constitution and laws of the United States."

Discussing the above provisions relating to a question wherein a county commissioner having been elected to the position of county auditor, the contesting candidate maintained that the contestee was ineligible under the statute, while the contestee attacked the constitutionality of the statute, the court said:

"The qualifications for eligibility to an elective office are prescribed by the Constitution and it is beyond the power of the Legislature either

to restrict or to enlarge the right given and defined by the Constitution. *State ex rel. Knappen* v. *Clough,* 23 Minn. 17; *State ex rel.* v. *Holman,* 58 Minn. 219, 59 N. W. 1006. * * * It follows that section 811, G. S. 1913, in so far as it attempts to render a county commissioner ineligible to the office of county auditor, impairs the right secured to every elector by the constitutional provision quoted and cannot be sustained."

The state of Mississippi had a statute providing that in the event the board of aldermen permitted an increase of indebtedness of a city during their term without a vote of the people such aldermen should be ineligible to succeed themselves. The Constitution (Const. 1890, § 250) provided:

"All qualified electors and no others, shall be eligible to office, except as otherwise provided in this Constitution."

An alderman who had permitted an increase of indebtedness was re-elected. His election was contested. He attacked the constitutionality of the statute. In deciding the matter in the case of *McCool et al.* v. *State ex rel. Howie, District Attorney,* 149 Miss. 82, 115 So. 121, 125, the court, after citing and analyzing a number of cases, said:

"In *State* v. *Henry,* 87 Miss. 125, 40 So. 152, 5 L. R. A. (N. S.) 340, it was held by this court that, 'where the Constitution deals with a subject, its provisions cannot be enlarged or restricted by legislative enactment, in the absence of constitutional warrant for so doing'; and, 'where the Constitution enumerates power granted or denied, it must be held to have named all of the powers so dealt with and as being, with the necessary implications, the sole limit of authority or restriction.' This is a familiar rule of constitutional and statutory construction, and has been announced in many other cases."

The Supreme Court of the State of New Mexico, speaking through Mr. Justice Bratton in the case of *Gibbany* v. *Ford,* 29 N. M. 621, 225 P. 577, 579, and after comparing the similarity of statutes and constitutional provisions, said:

"A case which we consider in point is *State ex rel. Childs* v. *Holman et al.,* 58 Minn. 219, 59 N. W. 1006." Cited, supra, in *Hoffman* v. *Downs.*

A section of the Penal Code of the state of New York provided that where an elected candidate fails for ten days after election to file an itemized, verified statement of his election expenses, he shall forfeit his office.

The state Constitution of New York (art. 13, § 1) prescribed the form of the oath to be taken by all except such inferior officers as may be exempted by law and provided:

"And no other oath, declaration or test shall be required as a qualification for any office of public trust."

The court held that:

"The section of the Penal Code referred to is the requirement of an oath other than that prescribed by the Constitution as a condition for holding public office, and seems to me, therefore, to be in direct conflict with such Constitution." *Stryker* v. *Churchill*, 39 Misc. 578, 80 N. Y. S. 588, 589; *People ex rel. Bishop* v. *Palen*, 74 Hun, 289, 26 N. Y. S. 225.

Many of the state Constitutions have similar provisions, many of them have diferent provisions, some of them are stated negatively, some of them affirmatively; but in the main the provisions except for certain details seem to have but one purpose, and that purpose in so far as constitutional officers are concerned is to provide such qualifications for the holding of office as is deemed proper and to protect all citizens so qualified in that right. Numerous, extended, or detailed requirements for the holding of public office have never been favored. It is the one nearly universal right that supports citizenship, makes citizenship desirable, and government representative. The general purpose of constitutional limitations as to eligibility qualifications seems to be that all citizens have this fundamental right unless expressly excluded or disqualified by some express statement in the Constitution denying the right.

In the case of *State* v. *Williams*, 20 S. C. 12, the court said:

"The office of clerk of the court of Common Pleas is an office 'elective by the people,' and the fact that the election at which Williams was elected took place during the term for which he had been ap-

pointed supervisor of registration, could not render him ineligible to such office, as that is not one of the causes of ineligibility provided for in the constitution, and it is beyond the competency of the legislature to add another cause of ineligibility to those provided for in that instrument. The language of the constitution is affirmative, not negative merely. It in effect declares that every qualified voter shall be eligible to any elective office, unless he labors under some one of the disabilities mentioned in the constitution; and hence any attempt on the part of the legislature to add any other disability, would be in direct conflict with the positive mandate of the constitution, and, therefore, void."

### An Indiana case contains the following:

"The General Assembly cannot impose qualifications upon officers beyond those prescribed by the Constitution."

### Citing a long list of cases. Also:

"The true distinction is that as to constitutional offices, and where the qualifications of officers are defined by the Constitution, no other qualifications can be imposed; but that is not true as to offices of purely legislative creation, where the Constitution is silent as to qualification."

### Further quoting Cooley's Const. Lim. (5th Ed.) § 115 note:

"Where the Constitution contains no negative words to limit the legislative authority in this regard (qualifications of election or appointment to office), the legislature in enacting a law must decide for itself what are the suitable, convenient, or necessary agencies for its execution." *State ex rel.* v. *Goldthait,* 172 Ind. 210, 87 N. E. 133, 19 Ann. Cas. 737.

In the case of *Black* v. *Trower et al.,* 79 Va. 123, the court had the question of whether a statute imposing a *freeholder* qualification was constitutional. The statute provided that "three qualified voters, who shall be *freeholders* and residents" shall be appointed to a certain board, and further provided they should take the usual oath of office.

The Constitution declared that "all citizens of the State * * * possess equal civil and political rights and public privileges." Const. 1870, art. 1, § 20.

Discussing the question the court said:

"The language thus employed was plainly intended not as idle or empty words, but to express a principle which lies at the very foundation of the government."

And:

"Clearly it is not within the power of the legislature thus to limit the range of selection of public officers; and the act in question is in contravention no less of the rights of the public at large, than of those citizens of the state who are wrongfully excluded by its provisions."

It would seem to be unnecessary to quote from or cite further cases. The doctrine seems to be settled beyond question that when a state Constitution has spoken upon the question of eligibility to hold office or the qualifications that must be possessed by one elected to a constitutional office, it is beyond the power of the Legislature to render a person eligible to hold public office who does not possess the qualifications prescribed by the Constitution, or to prescribe an additional qualification to those prescribed to hold an office whether created by the Constitution or statute unless the Constitution itself expressly so provides. *Rose* v. *Sullivan*, 56 Mont. 480, 185 P. 562.

Typical of decisions where cases discuss affirmative rather than negative constitutional provisions is *Sprill* v. *Bateman*, 162 N. C. 589, 77 S. E. 768, 769, Ann. Cas. 1915B, 515. At the election in November, 1912, Bateman was elected by the people of Washington county recorder of the "Recorders Court of Plymouth," an office created by statute. The statute (Pub. Loc. Laws 1911, c. 343, § 2) prescribed that the recorder shall be "a qualified voter of Washington County and a man of good moral character and a licensed attorney at law." Bateman did not hold a license to practice law. Action was brought to oust him from office on that ground. As to that question the court has this to say:

"The Constitution of this state (article 6) prescribes who shall be 'Voters,' and section 7 of that article provides: 'Every voter in North

Carolina, except as in this article disqualified, shall be eligible to office.' The Legislature is therefore forbidden by the organic instrument to disqualify any voter not disqualified by that article from holding any office. The General Assembly cannot render any 'voter' ineligible for office by exacting any additional qualifications, as by prescribing in this instance that the candidate shall be 'a licensed attorney at law,' any more than it could prescribe that he should own a specified quantity of property, or should be of a certain age, or race or religious belief or possess any other qualification not required to make him a voter."

The court then says that where the Constitution requires only that the candidate shall be a voter the Legislature can add additional qualifications, and then quotes from the North Carolina Constitution the statement that: *"Every voter* (unless as in this article disqualified) *shall be eligible to office."*

A right guaranteed to every voter by the Constitution cannot be taken away or abridged by legislative provision; any act of the Legislature designed to impose upon a citizen any other disability than imposed by the organic law of the state would be unconstitutional and void. *State* v. *Williams,* 20 S. C. 12; *State ex rel. Childs, Atty. Gen.,* v. *Holman,* supra.

Cases discussing constitutional provisions of both the positive and the negative type have been cited. And as a general principle there would seem to be no reason to modify or depart from the doctrine of the case of *Kimball* v. *Grantsville City,* 19 Utah 368, 57 P. 1, 45 L. R. A. 628. While the question there discussed was one relating to taxation, this court, however, at page 382 of 19 Utah, 57 P. 1, 4, laid down this doctrine:

"The powers of the state government were, by the organic law, divided into three distinct departments—the legislative, executive, and judicial,—and no person or persons whose duty it is to exercise the functions of one department can exercise any power belonging properly to either of the others, except in cases expressly authorized by the constitution. The legislative power was vested exclusively in the legislature, and it is within its sphere to make the laws for the government of the state. The power to execute the laws was referred to the executive department, and the power to declare what are the laws

to the judiciary. The departments are all upon the same plane; all are co-ordinate branches of the same government; each absolute within its sphere, except as limited or controlled by the constitution of this state or of the United States. The apportionment of distinct power to one department of itself implies an inhibition against its exercise by either of the other departments. The state having thus committed its whole lawmaking power to the legislature, excepting such as is expressly or impliedly withheld by the state or federal constitution, it has plenary power for all purposes of civil government."

From the foregoing it would seem that if the filing of a bond be regarded either as a matter of eligibility or qualification as a prerequisite to assuming the duties of the office of State Treasurer, question No. (1):

"Having in mind the provisions of the State Constitution of the State of Utah has the Legislature the power to pass a law imposing as a prerequisite, or as a condition precedent, the filing of a bond *before* the State Treasurer, elect, may assume or enter upon the duties of his office," must be answered in the negative, viz., that the Legislature has no such power. The filing of a bond is not a qualifying prerequisite as provided by the Constitution to assume the duties of an office. The Constitution has spoken upon that subject and the Legislature may not add thereto. It is clear, therefore, that as an eligibility or qualifying prerequisite such requirement is not a duty requiring that a State Treasurer "shall perform such duties as are prescribed by this Constitution." Article 7, § 1.

We are thus brought to question numbered (2):

"Assuming that the Legislature has the power or authority so to do, and thereby answering (question No. 1) in the affirmative (although herein answered negatively), *has* the Legislature prescribed that *previous to* or *before entering upon the duties of his office the State Treasurer shall give a bond?*"

Surprising as it may be, the plain, unequivocal provisions of the statutes would seem to dictate this question must, as was question No. 1, be answered in the negative.

It is argued in the prevailing opinion that:

(a) "Long before Utah was admitted to statehood an act of the territorial Legislature was passed requiring the giving of a bond by the treasurer of the then territory of Utah, which law was in effect

at the time of the adoption of our state Constitution, *and in amended form as continued in effect until the* present time." (Italics added.)

(b) "The Constitution expressly provides that all territorial laws not in conflict with the Constitution should remain in force until altered or repealed by the State Legislature."

(c) "The language of article 7, § 10, wherein it is provided that certain officers appointed by the Governor shall hold office until their successors shall be elected and qualified, *as may be by law provided,* lends support to the claim that the Constitution was not intended to preclude the Legislature from requiring the giving of a bond by officers intrusted with public moneys."

(d) "It is difficult to believe that those who took part in drafting our state Constitution or the people who voted for its adoption believed that anything therein contained precluded the Legislature from requiring a public officer who is intrusted with the custody of public moneys to give a bond as *an assurance for the faithful* accounting of such moneys." (Italics added.)

It may be "difficult to believe" many things we are required to not only believe but to accept. It may be difficult to believe that the first State Treasurer who served for a term of five years filed no official bond as State Treasurer, during the whole term of his office. Yet such seems to be the fact. And whether pleaded herein or not, the public record of which notice may be taken requires us to accept that fact, whether of much or little weight. It may be difficult to believe the first Secretary of State filed no official bond during either the first or second terms of his office. Yet such seems to be the fact. It may seem difficult to believe that although the Laws of Utah 1896, c. 61, p. 174, provided, "The Secretary of State must execute an official bond in the sum of ten thousand dollars," that notwithstanding the repeal of such provision by the Revised Statute of 1898, no provision was provided for the Secretary of State to file an official bond until 1905. The real question is, not what is difficult or easy to believe, but what is the law upon the subject?

Enough has been said about paragraph (d), above quoted from the prevailing opinion.

It would appear that the language of article 7, § 10, by its terms lodges the appointive power with the Governor, for vacancies that may occur in all state and district offices established by the Constitution, "or which may be created by law," and declares "the appointee shall hold his office until his successor shall be elected and qualified, as *may be by law provided.*" (Italics added.) It would require an unusual construction of the language to make the language of that section apply to a situation other than that of a "successor" to an "appointee," and we have not that situation before us in the instant case. If emphasis upon that point were needed, the next preceding section of the Constitution furnishes it wherein it provides that "when any State or district office shall become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the Governor shall have the power to fill the same by granting a commission, which shall expire at the next election, and upon qualification of the person elected to such office." Const. Utah, art. 7, § 9.

What is meant by "until his successor shall be elected and qualified," (section 10, supra), and "upon qualification of the person elected," in so far as constitutional offices are concerned, can mean no more and go no further than the taking of the constitutional oath of office as by the Constitution provided. It may be noted again that as relating to "qualification" of an officer elect, the Constitution is silent as to the matter of an official bond; but article 4, § 10, does make the taking of the prescribed constitutional oath a *condition precedent,* or at least prescribes that *before* entering upon the duties of the office, "all officers made elective or appointive by this Constitution or by the laws made in pursuance thereof, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation." Then follows the constitutional oath of office. Had the framers of the Constitution intended that the filing of an official bond should be a condition precedent, it would have been a simple matter to have in-

serted after the word "shall," and before the word "take,"
the words "file an official bond."

"When the Constitution prescribes the formalities of qualification
the legislature cannot add thereto." 59 C. J. p. 133, § 198.

"Where a constitution defines the qualification of an officer, it
is not within the power of the legislature to change or superadd to
it, unless the power be expressly, or by necessary implication, given
to it." *Thomas* v. *Owens*, 4 Md. 189.

The framers of the Constitution no doubt had very good
reasons for not inserting such a limitation in the Constitution. Many reasons that may seem sound and satisfactory
to some may not appeal to others; but that good reasons may
be plausibly advanced for either position or what they are
could only be arguments upon the issues herein. Aside from
the reasons or arguments the framers of the Constitution
may have had in mind, it is clear that the members of the
constitutional convention were familiar with the territorial
law requiring officers to file an official bond. That is a
matter of knowledge they were charged to know. Being
so charged, the omission must have been intentional and is
significant. Had they intended that state constitutional officers should be required to file an official bond before
entering upon the duties of their offices, such provision
would either have been put into the Constitution as a requirement, or authority would have been given in terms to
the Legislature to require the filing of a bond. Certainly
had they intended such requirement should be made they
would not have impliedly denied it by prescribing what steps
should be taken and what things should be done, and what
eligibility qualifications must be possessed, before entering
upon the duties of an office, and then like Phoebe and Alice
Carey's order for a picture, "leave that out." Evidently the
first officers of the state must have so interpreted the Constitution, as none of them, as appears from the records, filed
an official bond until after the first state Legislature had
provided that they should, and then only two of them, the
Attorney General some two months after the law became ef-

fective and the State Superintendent some two years after the beginning of his term.

The statute of 1896 relating to the "State Board of Loan Commissioners," c. 77, would seem to imply either that the State Treasurer had or should give an official bond, but does not prescribe when. It is there prescribed:

"Before the issuance of any such (State) bonds the State Treasurer shall give to the State of Utah an additional official bond."

The wording of the statutes relating to the official bonds of state executive officer has more than passing significance when compared. To require the filing of an official bond by a state officer as most of those statutes read *before* entering upon the duties of his office requires an interpolation or replacing of wording deleted from earlier statutes on the same subject.

The only exaction made by the Constitution of a constitutional state officer is election by the required vote, the eligibility qualifications and *before* entering upon the duties of the office the taking of the constitutional oath.

The Comp. Laws Utah 1876, title 4, c. 1, § 2, p. 91, provided:

"The treasurer, *previous to entering upon the duties of his office, shall give bonds. * * *"* (Italics added.)

Comp. Laws Utah 1888, c. 3, p. 250, § 9 provided:

"The Territorial Treasurer shall, *before entering upon the duties of his office,* take and subscribe an oath * * * *and shall give a bond to the Territory.*"

How stands the law after the adoption of the state Constitution? Laws of Utah 1896, c. 53, § 8:

"The State Treasurer must execute an official bond in the sum of three hundred and fifty thousand dollars."

Is there no significance to be attached to the omission of the words "previous to" and "before entering" upon the duties of his office, found in the territorial laws, and omitted from the state laws?

In Rev. Statutes 1898 the wording of section 2435 is identical with the wording of the 1896 statute. In Comp. Laws Utah 1907, § 2435, the same wording is carried forward. Likewise section 5732, Comp. Laws Utah 1917. By the Laws of Utah 1921, c. 129, § 5732 of Comp. Laws 1917 was amended to read:

"The state treasurer shall give to the state a surety company bond in the sum of $350,000.00; the premium of said bond shall be paid by the state."

Even then no provision is inserted into the statute similar to the provision before statehood.

The same provision is carried into the R. S. Utah 1933, 87-5-9.

Similar provisions with substantially the same wording are to be found in the statutes relating to the other state constitutional officers. The only other state constitutional officers that the statutes provide shall give official bonds are Secretary of State, Attorney General, State Auditor, and Superintendent of Public Instruction. *In none of the statutes* relating to the giving of a bond of these officers do we find the words *"before," "previous,"* or even *"upon"* or *"at the time"* of entering upon the duties of the respective offices a bond shall be given.

Of some state offices created by statute the officers are required by express terms of the statutes *before entering* upon the duties of their respective offices to take the constitutional oath and file a bond. Among those so required are State Engineer, 100-2-2, R. S. Utah 1933; District Attorney, 87-8-3, R. S. Utah 1933; members of the State Tax Commission, 80-5-39; Trustees for the School for the Deaf and Blind, 85-3-5. As to the other statutory officers the statutes are either silent as to a bond or no specific time is stated when such bonds as are required shall be furnished. Not many school officers whether constitutional or statutory are required by the statutes to give a bond. In so far as school funds are concerned there would seem to be no neces-

sity except as a matter of indemnity or reimbursement, as the state has undertaken to guarantee such funds in the following sweeping language:

"All public School Funds shall be guaranteed by the State against loss or diversion." Const. Utah, art. 10, § 7.

In the judicial department no official bonds are required. In the legislative department no official bonds are required. No bond is required of the Governor in his capacity as such, nor in any of the exofficio capacities, or boards of which he is by law made a member although other members of such boards are required to file their official bonds.

Whether from design or from other consideration the Legislature of the state has passed no statute that requires a state constitutional officer to file or furnish a bond *"previous to"* or *"before entering upon the duties of his office."* It would seem, therefore, that question No. (2), namely: "Assuming that the Legislature has the power or authority so to do, * * * has the Legislature of the State of Utah prescribed that *previous to* or *before entering* upon the duties of his office," the State Treasurer shall execute or file an official bond, must, because of the plain provisions of the statute, be answered negatively and to the effect that the Legislature has not so provided.

While the questions herein propounded in some of their aspects overlap, we shall proceed to question numbered (3). Aside from the provisions of the statutes which are clear on the subject, we are not without authority among the decided cases. The fact that subsequent to the first, and in certain instances the second, term of office of the state officers they may have either before or after the taking of the prescribed constitutional oath filed an official bond cannot weigh against the provisions of the Constitution or the law. Whether the Legislature has construed the Constitution in this regard, and it is difficult to suggest that it has, when there are no provisions in the Constitution relating to filing bonds of state officers to be construed, it has, it would seem, at least recognized the proper limita-

tions relating to the subject as dictated by all the implications prevailing. There being harmony between the Constitution and the law, or at least no conflict, upon the question of not requiring a bond *before or previous to entering upon their official duties,* it is not surprising that we find harmony or at least support in the decided cases.

"Legislative constructions of constitutional provisions are not binding, but if continuing for many years are entitled to respectful consideration, and, if uniform and long acquiesced in by people and officers, raise a strong presumption that construction is correct." *State* v. *Callow,* 78 Mont. 308, 254 P. 187, 188.

So far as any legislative construction has been made such construction has not required an official bond of any state constitutional officer as a condition precedent, or before entering upon the duties of their respective offices. That a bond may have been filed as an assumed part of an official qualification by certain or all officers is not a legislative construction of the Constitution.

While the facts are not similar to the instant case, the doctrine of the cases is clearly applicable. In the case of *State ex rel. Chealander* v. *Carroll,* 57 Wash. 202, 106 P. 748, 750, we find the following statement of the law:

"The failure to give a bond does not render an officer duly elected or appointed a de facto officer. He is a de jure officer, holding by a defeasible title. *Foot* v. *Stiles,* 57 N. Y. 399. The giving of a bond is a mere ministerial act for the security of the government, and not a condition precedent to the officers authority to act, unless especially made so by statute. *Glavey* v. *United States,* 182 U. S. 595, 21 S. Ct. 891, 45 L. Ed. 1247. The courts generally hold that, even though the statute expressly provides that, upon a failure to give a bond within the time prescribed, the office shall be deemed vacant, and may be filled by appointment, the default is a ground for forfeiture only, not forfeiture ipso facto, and that if, notwithstanding such default, the state or other power sees fit to excuse the delinquency by granting the officer his commission, the defects of his title are cured, and it is a title de jure, having relation back to the time of his election or appointment. *People ex rel.* v. *Benfield,* 80 Mich. 265, 45 N. W. 135." (See Michigan cases.) *Cronin* v. *Stoddard,* 97 N. Y. 271.

In the case of *City of Houston* v. *Estes*, 35 Tex Civ. App. 99, 79 S. W. 848, 851, the doctrine of the Glavey Case and the Benfield Case, supra, is adhered to. In the Texas case the question arose in a suit for recovery of salary. The officer had taken the official oath, and had filed a bond. The bond did not contain some of the conditions required, but was not objected to at the time of filing. In discussing the matter the court said:

"While the manner of his qualification might not have been in strict conformity with the requirements of the charter and ordinances, he took the official oath and gave a bond, which was accepted without objection, and no question was made concerning it at any time during his term. That under these facts he became an officer de jure is sustained by the weight of authority. (Citing cases.) He was thereafter discharged without cause by one having no authority to oust him, and this in direct contradiction of an explicit charter provision. The effort to oust him was a nullity, and, his salary being an incident of the office, his right to the emoluments did not depend on the performance by him of official service."

In the case of *Rounds* v. *City of Bangor*, 46 Me. 541, 74 Am. Dec. 469, the statute required that the pound keeper "shall give a bond * * * *before he shall be entitled to act as such pound keeper"*; it was held that "until the bond was approved, Mansfield was not the pound keeper of the city."

The Utah statute relating to State Treasurer does not make the requirement prescribed by the Maine statute.

Utah does not have a general statute relating to officers generally. Comp. Laws Utah 1917, § 7923, R. S. Utah 1933, 103-26-1, which provides:

"Every person who exercises any of the functions of a public office without having taken and filed the oath of office, or without having executed and filed the required bond, is guilty of a misdemeanor."

It may be noted that the above statute is stated in the alternative. It being a penal statute it might be questioned whether that statute requires both the taking of an oath and the filing of a bond. In any event, it would constitute no more than ground for forfeiture. In my view of the situa-

tion that statute is not applicable to the instant case. It has nothing to do with the matter of qualification for office. It may be that in a proper case the failure to either take and file the official oath or to file an official bond might make the offender guilty and subject to the penalty without affecting his right to the office.

The section must be read in connection with the section which follows it, viz.:

"The next preceding section shall not be construed to affect the validity of acts done by a person exercising the functions of a public office in fact where other persons than himself are interested in maintaining the validity of such acts." R. S. Utah 1933, 103-26-2.

Whether or not the Legislature may require a State Treasurer to file an official bond as a condition precedent to the entering upon the duties of his office, or previous thereto or before so doing, in so far as the issues of this case are concerned may be eliminated from the consideration entering into this decision. As the law now stands as it appears the Legislature has not done so.

This now brings us still nearer to the third question propounded at the beginning of this opinion. It may be superfluous to discuss that question; but the importance of this case, and to avoid the appearance of leaving a matter so closely related to the principles affecting a right so fundamental, not only a regard of the officer who has been the recipient of a favorable expression of the electorate of the state, but also as affecting the right of the people to have their choice made effective, and be entitled to have their will respected and not be defeated justifies a discussion of the question. Whatever the law is, we give respectful support, obedience, and fidelity thereto. We honor and sustain the law when we are law conscious as to what the law is. The seriousness of the removal of a person from a public office was tersely stated by Chief Justice Cooley of the Michigan Supreme Court in the case of *McGregor* v. *Board of Supervisors of Gladwin County,* 37 Mich. 388:

"The removal from a public office is a matter of serious consequence, and it is plain that all the facts which would justify it ought properly to be of record, and my brethren think it essential."

And where the question is one of law, if there is a difference the seriousness of the question is enhanced, as it may not only affect the person in the instant case, but all who come after that may be similarly situated, and gravity is added to the seriousness of the situation when the result is to determine or modify the basic law of the state as solemnly declared by the Constitution.

The right to call a person to a public trust rests with the people; eligibility to accept and respond to public trusts is a constitutional right which cannot be abridged or impaired other than as by the Constitution provided. The Constitution establishes and defines the right of suffrage and defines who shall be electors and gives to them the power to confer public trusts. It prescribes, in respect to certain offices, particular circumstances and qualifications without which a person is not eligible to those positions of public trust and responsibility; it provides that if persons hold certain offices they shall be ineligible to certain other offices. Except for the particular exclusions and defined incompetences, the electors and the appointing power are by the Constitution entirely free to call to public stations or confer public trusts or favors according to their pleasure. Freedom of choice is fundamental and essential to the perpetuity, stability, and efficiency of a free government. The Constitution having declared that certain persons are not eligible to office, and that certain others are incompetent to hold public office, it follows from these powers and provisions that all others are eligible. The distinction between offices created by the Constitution and those created by statute has been clearly shown in the excerpts from the cases hereinbefore cited and quoted.

Upon principle and according to the cases where the question has arisen, a distinction between eligibility, elec-

tion, and qualification on the one hand, and entering into the office or assuming the responsibilities and undertaking the performance of the duties thereof once they are assumed on the other hand, seems to have been made. That the Legislature has the power to prescribe the duties to be performed by the State Treasurer once he is in the office is a very different question from that of requiring the filing of a bond as a condition precedent to assuming the duties of the office. The Utah Constitution, art. 7, § 17, provides:

"The Auditor shall be Auditor of Public Accounts, and the Treasurer shall be the custodian of public moneys, and each shall perform such other duties as may be provided by law."

It is the power to prescribe the *performance* of the *duties* of the office that is by the Constitution fully vested in the Legislature. Manifestly one cannot perform the duties of an office until he has been inducted into that office. Once in the office, the power to prescribe the duties to be performed by the officer is by the Constitution expressly given to the Legislature. The principal duties of a State Treasurer are to receive, safely keep, and faithfully account for state moneys and property. The State Treasurer's duties as indicated by the Constitution are custodial. Any misuse or diversion of public funds is by the Constitution deemed a felony and may be punished as the Legislature may provide:

"The making of profit out of public monies, or using the same for any purpose not authorized by law, by any public officer, shall be deemed a felony, and shall be punished as provided by law, but part of such punishment shall be disqualification to hold public office." (Const. art. 13, § 8.)

The State Treasurer being custodian of public "monies" (moneys), the duties of receiving, keeping, and properly disbursing such is necessarily the chief purpose in the creation of the office. The method of handling public moneys, the purposes to which it may be applied, the measures to be taken and applied, the method or system of bookkeeping,

the organization of administrative forces, proper, efficient, and frequent audits, places of deposit pending payment or disbursement, are all regulatory measures pertaining to the duties of the office within the power of the Legislature to prescribe. Additional duties are often by the Legislature added to those of the constitutional office of State Treasurer. Other offices are created of which he is or may be made solely or in association with others and holder thereof as an ex officio officer. Bonds may be required of him either as a condition precedent to the entering into or assuming the duties of such statutory offices; but the failure either to assume the duties of those offices or to give the required bond may be a ground of forfeiture of that office, without affecting his tenure or right to hold the office of State Treasurer. One would hardly argue that the Legislature might as a condition precedent to qualification or holding the office of State Treasurer be, by the Legislature, required to qualify for a created statutory office, or perform any other duty not related to the custody of state funds and property. Accounting for public money or property is a duty of the office of State Treasurer. The Constitution has spoken upon that subject, and for that reason he may not be required to be learned in the law, or represent the state in other capacities in no way related to the duties of his office, and notwithstanding a bond may not be required as a condition precedent to assuming the duties of his office, a bond may be required guaranteeing a faithful accounting of public funds or property of which he is the proper custodian.

By the laws of the state of Nevada the Lieutenant Governor was made ex officio state librarian. As such he was required to execute an official bond with sureties approved by the Governor. The statute provided, among other things, that upon his bond becoming insufficient and upon his failure within a specified time and after a prescribed procedure, the office should become vacant. The Lieutenant Governor's bond became as state librarian within the statute and procedure insufficient. He failed to file a new or ad-

ditional bond as state librarian. The Governor filed in the office of Secretary of State his written proclamation declaring the office of state librarian vacant. In passing upon the matter, Leonard, J., speaking on behalf of the court, said:

"Making a person an ex officio officer, by virtue of his holding another office, does not merge the two into one. *People* v. *Edwards*, 9 Cal. 286; *People* v. *Love*, 25 Cal. 520; *Lathrop* v. *Brittain*, 30 Cal. 680; *People* v. *Ross*, 38 Cal. 76; *Territory* v. *Ritter*, 1 Wyo. 333; *Denver* v. *Hobart*, 10 Nev. 31. It is true, the lieutenant governor is required to give the bond, (not) because the lieutenant governor and librarian are one person; but he gives it for the ex officio office, not the principal one. * * * We cannot say in this proceeding that respondent's right to hold the office of lieutenant governor, and enjoy the emoluments thereof, depends upon a faithful discharge of the duties of state librarian, or upon his compliance with the statute concerning the bond required of him as librarian." *State* v. *Laughton,* 19 Nev. 202, 8 P. 344, 345.

The prevailing opinion quotes from and approves the case of *State of North Carolina by the Attorney General, Hargrove, ex rel. Lee* v. *Dunn*, 73 N. C. 595, and usually referred to as *Lee* v. *Dunn*. It is not difficult to approve much that is said in that case. The difficulty is encountered in the distinction made and the application of what is said. The case cites no authority outside the North Carolina case of *Van Bokkelen* v. *Canaday*, 74 N. C. 198, 21 Am. Rep. 465. The case of *Lee* v. *Dunn*, supra, seems to clearly lay down the doctrine that the Legislature has no authority to prescribe eligibility qualifications not prescribed by the Constitution. The question arose over a statute requiring a sheriff elect, who had theretofore been a sheriff, to produce his tax receipts from the proper officer, before again being inducted into office. It was held that the statute was not unconstitutional. It was further held that the statute imposed no additional qualification upon eligibility to the office of sheriff than those required by the Constitution, yet the court supported the board of commssioners in refusing to permit the sheriff elect to enter upon the duties of the office

until he produced the proper tax receipts. In so far as that phase of the case is concerned, the position seems inconsistent. The court then proceeds to develop a matter designated as "appropriate *assurances*" for "faithfulness." Had the court permitted the induction into office and then ousted him upon the ground of being a defaulter, the apparent inconsistency would disappear. In its opinion the court says:

"The Constitution creates, or rather recognizes the existence of, the office of sheriff. It does not prescribe the duties of the office. And yet, we cannot impute the folly of creating an office without any duties. And so we have to assume, either that the Constitution meant to recognize the office of sheriff already existing, with all its duties. and regulations, or else, that the Legislature should prescribe its duties and regulations anew. Either aspect is fatal to the relator and fully justifies the Board. At the time of the adoption of the Constitution, and for a long time before, our statute law required a sheriff elected to a second term to exhibit a receipt for the settlement of the taxes, etc., before entering upon the duties of his second term. * * * And yet it was never before supposed that these regulations were elements of *eligibility* or *qualifications* for office."

The case of *Lee* v. *Dunn* is discussed and some further distinction drawn in the case of *Spruill* v. *Bateman*, 162 N. C. 589, at page 593, 77 S. E. 768, 769, Ann. Cas. 1915B, 515, as follows:

"In *Lee* v. *Dunn*, 73 N. C. 595, this subject was fully gone into, and it was held that the General Assembly could not impose any additional qualification upon eligibility to office other than that the officer should be a voter as required by Const. art. 6, § 7, above quoted, but a mere assurance for the faithful discharge of the duties of the office, such as a bond to answer for money intrusted to his care, and, when an official has been in office already, a receipt for the money paid over as evidence of his integrity is not an added 'qualification.' The court go on to say that even the requirement of an oath by the Constitution itself does not affect eligibility because that is required after election, and is only an assurance that the officer will faithfully discharge the duties of the office. The court added that any legislation which directly or indirectly denies or abridges the right of a citizen to vote as specified in the Constitution is invalid, and that 'what is true of the right to vote is also true of the right to hold office.' Brightly on Elections, 44; *McCafferty* v. *Guyer*, 59 Pa. 109. Whoever is entitled to vote is entitled under our Constitution to hold office, except where

restricted by that instrument. The constitutional provision in these matters cannot be abridged by requiring any qualifications whatever in addition to those set out in the Constitution. A requirement that a man shall be a lawyer is not an 'assurance' like a bond, but an additional 'qualification.'

"The requirements as to age of certain officers, and the disqualification of the Governor for re-election are in the Constitution, and cannot be changed, nor applied to other officers, by the Legislature. The ordinary provision that election officers shall not be all of the same political party is not an additional 'qualification,' but a mere regulation or 'assurance,' as recognized in *Lee* v. *Dunn*. Besides, it may well be that such positions are not 'offices,' but mere 'places of trust or of profit' whose qualifications may be prescribed by legislation. But as to this last point we need not now decide. The Constitution recognizes the clear distinction between 'offices' (article 6, § 7), and 'places of trust or of profit' (article 14, § 7). *Worthy* v. *Barrett*, 63 N. C. 199; *Doyle* v. *Raleigh*, 89 N. C. 136, 45 Am. Rep. 677. But the line has not been clearly marked, and we are not called upon to do so in this case, for it is clear that the recorder's position is an office."

While the matter of filing a bond is referred to incidentally in the opinion, that question was not an issue. The case was decided solely upon the failure of the sheriff elect to produce his tax receipt demanded by the board, and upon the ground that the office of sheriff and the law requiring the presentation of the tax receipt were in force when the Constitution was adopted, and was for those reasons recognized.

Applying the argument of that case to the situation before us, the *assurance* referred to is an *assurance* relating to the performance of duties relating to an office. Under the Constitution and the laws of Utah the application of the bonded *assurance* applied to the *performance of duties after* the assumption of the duties of the office. So long as the duties of an office are faithfully performed, and all funds are properly and according to law accounted for, the matter of a bond is purely formal. It is in a sense a mortgage security not foreclosed. It is a contingency effective only upon failure to perform according to law. A bond being required,

it is directed to the performance of a duty, and a failure to furnish such can be no more than a breach of duty, subjecting the officer so failing to the penalties provided by the statute. As was said in the case of *Lee* v. *Dunn*, supra:

"It was never before supposed that these regulations were elements of *eligibility* or *qualifications* for office. It is a prudent *business regulation* to hold an agent to short settlements and frequent exhibitions of his vouchers. And our experience and knowledge of human nature teach us that one who has been tried and found faithful may reasonably be trusted again, and on the contrary, one who has been tried and found wanting, ought no longer to be trusted. It is only by one's deportment in office that he acquires the reputation of a faithful or a faithless public servant. And such reputation is often the most satisfactory assurance that he will or will not be faithful if trusted again."

The presumption, however, must be indulged that a person is honest until he has shown himself to be otherwise. Surely a person, who has so demeaned himself among his fellows, whether in public or in private life, to be considered worthy to be nominated and elected to a responsible public position, should not be stopped at the threshhold by the mere fiat of some unauthorized person whether he be an officer charged with the duties of a public office or not. No word has been cited in the law providing for any functionary to demand the filing and approval of a bond in the amount demanded in this case before the State Treasurer becomes a de jure officer. Had Mr. Christensen delivered the office to Mr. Stain, bond or no bond, no one would for a moment have argued Mr. Stain was not the de jure State Treasurer, fully qualified to perform the duties of the office as much as any other officer. The position taken by the prevailing opinion forces the acceptance of the proposition that it was Mr. Christensen's refusal that either authorized the Legislature to create a vacancy, or that the grounds for declaring a forfeiture were laid. No one denies, and all seem unqualifiedly to concede, that at any time before the appointment of Mr. Hoge, Mr. Stain would have been entitled to the office upon filing a bond.

The ethical or economic question involved in the policy of bonding public officials are not issues in this case. However, as a moral question the policy might be difficult to justify, and as an economic question it has under recent developments become heavily expensive. Formerly from more than one point of view the basis or reason for requiring a bond was different from that now prevailing. Probably the bond premium, if all the facts were known, is the sole cause of this litigation and the questions surrounding the objections to the induction of the treasurer elect, Mr. Stain, into office. It is unfortunate that such charges should find justification in the opinion of counsel sufficiently to make the charges in argument and far more so that there would seem sufficient to require notice of the suggestion in the opinion of the court. R. S. Utah, 65-0-12, which is the revised section of an earlier law, provides:

"The cost of any official bond required to be furnished by any public treasurer shall be paid out of the funds in the respective treasuries."

That section and other related ones of similar but more specific application present a question of economic policy to the people of this state. The exact or even the approximate cost of this policy has not been furnished in this case; but such as has been intimated and the laws and public records would probably disclose that the state and all subdivisions, including cities and school districts, pay a staggering sum annually as a guaranty that Utah's public officials are honest. It may be a reflection, but seems to be a fact.

The power to exact a bond either as a condition precedent to entering upon or assuming the duties of an office, or as a guaranty or an assurance that the officer will faithfully perform the duties of an office, is a legislative weapon which may be fraught with serious consequences. As heretofore intimated, such construction of the state Constitution amounts to much more than the mere matter of determina-

tion of who shall hold the office of State Treasurer until the next succeeding election or for the present term in any analysis of the instant case. Some recent legislation is indicative of what if carried to an extreme, could happen. The amount of an official bond should be such an amount as is reasonable, taking into consideration all of the circumstances. When the amount of an official bond becomes of such proportions that the furnishing of it is limited in so far as possibility or power is concerned to one or two corporations, and possibly to the determination of a single representative of one, the right to hold such an office, constitutional or otherwise, becomes an empty privilege not likely to be enjoyed except upon the consent of a financial representative who may be controlled by a political body or to be bartered away by those who dictate to whom premiums shall be paid. A person otherwise capable and fully eligible and qualified might, unless provision were made for a hearing and determination, be deprived of or ousted from an office solely because of the size of the bond, or because of a power or influence he may not be able to discover or capable of coping with if discovered. The character of surety, limitations as to who may qualify as a surety, burdensome exactions, or unreasonable or impossible conditions could be made of such character as to create what might amount to a virtual exclusion from or prohibition against the performance of official duties operating against a large part of the citizenship otherwise eligible, qualified, and desirable as public servants even after induction into office and assumption of the duties thereof.

The fourth subdivision of this discussion relates to whether or not a bond, even when by law provided for, being for the benefit of the state, may be waived.

As might be expected, the question of state waiver of a bond or irregularities or insufficiencies thereof has usually been raised in the adjudicated cases upon some breach of duty or by some third party seeking to enforce the terms of the bond.

In the case of *State ex rel. Mitchell* v. *Toomer,* 7 Rich. 216, the question of the validity of an official bond was raised by the sureties upon the ground of failure of the officer to file his bond within the time provided by law, and for other irregularities in qualifying. The court, citing cases and declaring the general principle, said:

"In all these cases the doctrine is affirmed, that the statutory provisions prescribing the manner of executing the bond, suing out the commission, or taking the oaths of office, are merely directory; and that the omission to qualify, by giving the bond, suing out the commission or taking the oaths of office, is cause of forfeiture; but so long as the officer appointed continues to exercise the duties of his office, his official acts as to third persons are legal."

The position was taken that the title to the office in question depended entirely upon a strict compliance on the part of the officer with all the provisions of law, "and that a failure in any one particular, renders his election absolutely void." Answering this contention the court further said:

"But it is clear, that such a conclusion cannot be reached, without coming in direct conflict with every respectable judicial adjudication on this branch of the law; for in all of these, to which reference has already been made, we find the doctrine broadly affirmed, that the only efficacy that is imparted to the official title, by a strict compliance with the provisions of the Act—such as the execution of the bond, and filing it in the Treasurer's office, suing out the commission, and taking and endorsing thereon the oaths of office within a given time— *is merely to protect it against forfeiture at the instance of the State. But if, instead of enforcing a forfeiture of the office, the State sees fit to excuse the delinquency of the officer by granting him a commission, the defects in his title, whatever they may be, are thereby completely cured,* and if he be already in office, his de facto title is immediately converted into a title de jure, and has relation back to the period of his election; or, if he be not in possession of the office at the time his right to enter thereon, as against all the world, is unquestionable." (Italics added.)

In the case of *Chicago* v. *Gage,* 95 Ill. 593, 35 Am. Rep. 182, a provision of the city charter provided:

"It shall be the duty of the clerk to notify all persons elected or appointed to office, of their election or appointment, and unless such

persons shall respectively qualify within fifteen days thereafter, the offices shall become vacant."

It was held that the right of forfeiture might be waived and the bonds accepted after the expiration of the period prescribed by the charter provision.

Mecham, in his work on Public Officers, cites with approval the foregoing cases.

The case of *City of Houston* v. *Estes*, 35 Tex. Civ. App. 99, 79 S. W. 848, 851, contains the following statement:

"That the execution of a proper bond is not a condition precedent to the right to the office is sustained by the decided weight of authority. If there is any valid objection to the bond, it must be urged, and the official given an opportunity to file another, curing the defect."

The case of *Clark* v. *Wonnacott*, 30 Idaho 98, 162 P. 1074, 1076, considered the question of a vacancy where the officer elect died before the time for qualifying arrived. Under the express provisions of the Idaho Code (Rev. Codes § 317, subd. 6), it was among other things provided:

"Every civil office shall be vacant upon the happening of either of the following events at any time before the expiration of the term of such office. * * * A failure to elect at the proper election, there being no incumbent to continue in office until his successor is elected and qualified, nor other provisions relating thereto."

A successor had been elected and had died before the time for qualifying had arrived. The office was that of county assessor. The court said:

"Under our present statute, providing for vacancies in office and how they may occur, it is not necessary, in order to avoid a vacancy in office, that the person elected to the office qualify upon the day fixed for the commencement of the term of his office, but he may qualify at any time during the term for which he was elected."

Until the passage of chapter 25, Second Special Session Laws of Utah 1933, no time was fixed within which any officer was required to qualify.

A question arose in the case of *State ex rel.* v. *Matassarin,* 114 Kan. 244, 217 P. 930, 934, wherein certain officers had been appointed but had ommitted to file their oaths of office. Discussing the effect of such omission, the court said:

"Those who omitted to file their oaths of office at the time of appointment had been reappointed to succeed themselves, and had since that time been serving as members of the board. Two of these who were appointed by Gov. Davis did make and file their oaths shortly before the present action was brought. In the absence of a provision in the law that such failure shall ipso facto operate as a forfeiture of the office or create a vacancy, there is no vacancy or separation from office. *The state has taken no steps to have a forfeiture declared or to oust these members from office for the omission to take and file their oaths and their omission did not create a vacancy warranting the appointment of their successors.*" (Italics added.)

In discussing these questions relating to public officers, it is important that the difference between a constitutional office or one created or recognized thereby, and an office created or established by statutory enactment, be kept in mind. In many cases certain principles of law may be applicable to both. In many it may be applicable to only the one immediately under consideration. The office of State Treasurer is a constitutional office, and the Legislature under the plain and explicit terms of the Constitution is limited thereby to prescribe the duties of the office and fix the salary.

Mr. Stain having been duly elected, his certificate of election having been issued to him, and having duly taken his oath of office as required by the Constitution, and further having applied to the proper authorities for his bond and still further offered to sign the bond, the Legislature could not legislate him out of his rights to the office, nor may his right thereto be forfeited without a proper procedure instituted by the state for a forfeiture and after having been duly tried upon the issues to be raised therein. And this would be true if it be conceded that the second special session act, chapter 25, supra, is valid and applicable to all officers elected after its enactment.

In order to deprive Mr. Stain of the office to which, it is conceded, he was legally elected, it being conceded that he possesses all the constitutional qualifications, and according to the construction herein maintained he has complied with each and every step prescribed by the Constitution and the laws, we are required to read into the Constitution and the statutes on the subject something that is not there. No attempt is made to suggest that the Constitution requires the filing of a bond as a qualification for the office, and the statute applicable to the bond reads:

"The state treasurer shall give to the state a surety company bond in the sum of $350,000.00; the premium of said bond shall be paid by the state."

No time is prescribed within which he shall give such bond. That the duty and burden of securing the bond has been assumed by the state will later be discussed.

Those who maintain that the execution and filing of a bond are conditions precedent to the entering into or assuming the duties of the office of State Treasurer and that such acts must take place as actual occurrences must read into the Constitution or the statute, or both of them, words importing such meaning as: "Before he enters upon the duties of his office," or, "Before he shall be deemed to have qualified," or, "Previous to entering upon or assuming the duties of his office" or "Upon entering upon the duties of his office, he shall give a bond." Neither the Constitution or the statutes contain any laguage justifying any such interpolations or additions. The language used is clear, concise, and explicit; there is no room for construction, and no necessity for adding any thing thereto to obtain the meaning.

Two other positions are argued: (a) That a bond is an essential requirement in the very nature of things before the duties of an office may be assumed, and that such requirement is reasonable; or (b) that the bond is in the nature of an assurance not connected with eligibility or

qualification but as a guaranty of one's honesty, integrity, or, may we say, ability to perform the duties of the office.

The four questions submitted as indicating the controlling elements of this case, as I see it, having been answered as they were, the conclusion of this discussion might well rest here. There are other and important matters referred to in the briefs submitted and not considered in the prevailing opinion extensively. The care with which counsel submitted the questions and discussed them entitles them, it seems to me, to further consideration.

As heretofore indicated, the official bonding situation in the state of Utah has assumed, as intimated by counsel, unusual proportions. It is questioned whether under the laws of the state of Utah, conceding for the moment that a bond must be furnished, whether it is the duty of the State Treasurer to furnish it. It is further asserted that he is precluded by law from furnishing his own bond, and that in so far as obtaining the bond is concerned, the treasurer's duty is discharged when he makes his application to the State Board of Supplies and Purchase, and that it then becomes a "mere ministerial act entirely within the power and control of the State Board of Supplies and Purchase, whose duty it is to procure said bond." If such is the law, namely, that it is a "mere ministerial act," and the authorities seem to divide upon that matter (Mecham on Public Officers, § 314), Mr. Stain could have applied for a writ of mandate requiring the State Board of Supplies and Purchase to perform that duty. Whether he was required to do so before bringing this action may be another question, and neither of them are before us; but whether or not the duty is ministerial or otherwise, the question of whose duty it is seems to be squarely here. Not only that, but if it is the duty of some one else or some board as provided by law to secure the bond, Mr. Stain should not be deprived of his office because of either the failure or refusal of such officer or state agency to perform such duty.

Section 5732, Comp. Laws Utah 1917, as amended by Laws of Utah 1921, c. 129, p. 362, provides:

"The state treasurer shall give to the state a surety company bond in the sum of $350,000.00; the premium of said bond shall be paid by the state."

This statute was carried forward into R. S. Utah 1933 as 87-5-9 without change and has not been amended.

It is not only admitted that the state has heretofore paid the premium for the State Treasurer's bond, but the law above quoted makes it the duty of the state to do so. Ordinarily when it is the duty of the state to pay an expense, some one is authorized to create that expense or obligation and a method for payment is provided. If no other method is prescribed, the beneficiary of the provision would be authorized. to incur the indebtedness and draw upon the proper fund for its payment. There is no provision authorizing the State Treasurer to directly incur this obligation. For some time it has been the law not only that the state should pay the premium for the bond, but the state has also set up the necessary administrative machinery and given exclusive control of the funds to be applied to this purpose to an authorized state agency. It is asserted that this state agency, whether authorized by law or not, has exercised the power and authority, "even to the extent of designating the surety company and the agent" to write the bond.

When the state elected to require the State Treasurer to furnish a surety company bond, if such requirement were intended as an additional qualification for the office, such requirement would be clearly outside anything contemplated or within the provisions of the Constitution. If it were contemplated as an additional duty as distinguished from the furnishing of security for the proper discharge of other duties, and as distinguished from personal security, the limitation would seem to be unreasonable unless the state contemplated the furnishing of the surety itself, or at least when it limited and directed the particular class or kind of

suretyship that should be furnished, the election amounted to an assumption of that responsibility.

If the state elects to say that it will accept Mr. Surety Company and no one else as satisfactory surety, certainly it is within the rule of permissible implications to say if the state requires its officers to secure Mr. Surety Company as the only acceptable and named surety, the requirement implies the power and authority to make Mr. Surety Company available, else it is unreasonable or impossible if Mr. Surety Company says "Nay, Nay, Pauline." To this add the further undertaking that the state agrees to pay Mr. Surety Company whatever premium is exacted in the event he is called upon to furnish such bond, which likewise raises a strong presumption that the state has arranged with Mr. Surety Company or will arrange to see that he is paid upon application being made. Under such circumstances the making of an application is purely a formal matter, the state having made Mr. Surety Company the only eligible bondsman and undertaken to assure his payment of the exacted premium for the service. There would seem to be good reason to infer that such was intended on the part of the state, for the reason that the state has further provided that the State Board of Supplies and Purchase shall "examine and approve, or disapprove, all requisitions and proposed expenditures of the several departments; except salaries or compensation of officers fixed by law and no requisition of any of the departments shall be allowed nor shall any obligation be created (except in compliance with the determinations and regulations of the board relating to emergency or other purchases) without the approval and certificate of the board."

That Mr. Stain was powerless to secure a bond himself under the provisions of the statutes above referred to is further fortified by the interpretation put upon the powers given to the administrative agencies set up by the state

covering this as well as other matters. The admitted record shows the following communication:

"The State of Utah
"Board of Supplies & Purchase
"Salt Lake City

"November 29, 1932

"Mr. Chas A. Stain,
"1977 South 12th East
"Salt Lake City, Utah.

"Dear Sir:

"The official bonds of elected State officers are filed for approval with the State Board of Examiners. Such bonds must bear the signed endorsement of all members of the Board.

"We are directed by the Board of Examiners to contact you in relation to the bond that will be necessary for you to file upon taking office and to inform you that such bond is to be bought by the Board of Supplies and Purchase.

"Will you therefore kindly get in touch with this office before obligating yourself to anyone to supply your bond.

"This Board also buys surety bonds for all State officials, whether Elective or Appointive officers, or employees. Requisition should be made upon us for any bonds required by law.

"We are at your service to assist you in any way we can.

"Anticipating with pleasure a visit from you, and thanking you for your cooperation.

"Very truly yours,
"[Signed] E. R. Miles,
"Executive Secretary
"Board of Supplies and Purchase."

It seems to me that any fair or reasonable interpretation of the statutes and the administrative agencies functioning thereunder as interpreted by those agencies, that they have put it beyond the power of Mr. Stain, or any other officer for that matter, to furnish the bond required. It would appear that it must be done by the state. So that, conceding that the Legislature has the power to require a constitutional state officer to furnish a bond, not as a prerequisite but as a duty of an office, still the Legislature has not made it a duty of the office of State Treasurer to furnish the statutory

bond; but that it has been made the duty of the agencies set up by the state to do so. Clearly, if such be the case, Mr. Stain should not be deprived of his office through no fault of his own.

Whether or not the requiring of an official bond is an exercise of sovereignty in pursuance of the Constitution or of that elastic creature known as the police power need not be discussed here. The Constitution, the statutes, and their purposes seem to be reconciled only upon some such basis, and we seem to have arrived at the situation where some state agency has failed or refused to function.

The following authorities, while being different in facts, support the principle suggested as to the effect of an officer failing or refusing to perform a duty affecting the qualification of another officer: In the case of *State* v. *Dahl*, 65 Wis. 510, 27 N. W. 343, at page 347, we find the following:

"It is urged that, because the clerk of the school district refused to approve and file the relator's bond, the relator is not the treasurer of said district, and that there is still a vacancy in such office. We do not think such construction should be given to the law. The person who has been elected or appointed to an office, and *who does all that is required of him by law to entitle him to hold the office*, cannot be deprived of such office by any willful or unjust refusal of the person or officer who is required to approve his official bond to give it his approval." (Italics added.)

Giving the statute of Utah any fair construction, it would seem that Mr. Stain has done all that is required of him. He has been elected by the required vote, he is eligible, possessing all the required qualifications, he has taken the required oath, he has applied to the officer by law given authority to secure his bond and as directed by such officer, and has made demand that the office be turned over to him.

There are cases holding that where a bond has been furnished and the officer whose duty it is to approve the same refuses or fails to approve a sufficient bond, the officer is nevertheless a de jure officer. *Dorian* v. *City of Paducah*, 136 Ky. 373, 124 S. W. 369. Assuming it to be the duty of

the state agencies to secure and pay for the bond, it is difficult to see a distinction between *securing a bond* and *approving a bond*. The failure of an officer to approve a bond is not attributable to the officer filing the bond. If it was the duty of another state agency to secure a bond for the State Treasurer and the means were placed at the disposal of such agency enabling it to secure such bond whether an arbitrary departure from duty or because of a misapprehension of the law, it is not attributable to the State Treasurer elect. *State ex rel. Boone County Attorney* v. *Willott*, 103 Neb. 798, 174 N. W. 429.

There are other and further reasons why I cannot agree with the result reached in the prevailing opinion. The prevailing opinion is bottomed on two propositions as originally constructed: First, upon the doctrine of the case of *Lee* v. *Dunn*, supra, setting forth the "further assurance" idea of a bond, rather than the requirement to furnish a bond as a duty of the office; and, second, the constitutionality of chapters 13 and 25 of the Second Special Session of the Legislature of 1933. In view of some modifications of the prevailing opinion, more than enough has been said about the first proposition.

Counsel for both Mr. Stain and Mr. Christensen attack the constitutionality of chapters 13 and 25 of the Second Special Session Laws, supra, partly upon the same and partly upon different grounds. The prevailing opinion takes the position that the issues before this court are the issues as of the date of the filing of the petition for the writ of quo warranto herein, and thus ignores the rights of both Mr. Stain and Mr. Christensen as the rights between them were fixed and determined as of January 2, 1933, when demand for the office was made by Mr. Stain and the regular term of Mr. Christensen expired.

Taking either horn of the dilemma forces an anticipatory assumption of the constitutionality of the Special Session Laws. Either Mr. Stain was the de jure State Treasurer at the time he demanded the office, or he was the elected State

Treasurer subject only to his right upon the execution and filing of an official bond to assume the office, or he had forfeited the right to the office and was not an officer in any sense of the term. If claimed he had forfeited his right to the office, a matter not legislative in its nature and not judicially determined, then Mr. Christensen had a right to hold over until that matter was judicially determined. The rights of both were on the basis of the law as it existed at that time. If Mr. Christensen was at that time either the de jure or the de facto State Treasurer, there was no vacancy, and the Legislature was without power to declare one and make it effective in such way as to change the rights of Mr. Stain and Mr. Christensen without making the law retroactive. The mere expiration of a term of office does not create a vacancy. The prevailing opinion in effect so holds, yet proceeds to hold that by or because of the Special Session Laws, c. 25, one was created. Such position seems to be utterly untenable. Either Mr. Christensen was entitled to hold for the term under the law as it existed January 2, 1933, or until Mr. Stain was entitled to the office, or there was a vacancy at that time, and as to the latter no one seems to take that position. There can be no appointment unless there is a vacancy. *Clark* v. *Wonnacott*, 30 Idaho 98, 162 P. 1074; note 74 A. L. R. 486; *State* v. *Elliott*, 13 Utah 471, 45 P. 346; note 50 L. R. A. (N. S.) 368.

When a vacancy exists the appointive power rests with the Governor of the state. The Constitution, art. 7, § 10, contains the following:

"If the office of justice of the supreme or district court, Secretary of the State, State Auditor, State Treasurer, Attorney-General or Superintendent of Public Instruction be vacated by death, resignation or otherwise, it shall be the duty of the Governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified, as may be by law provided."

On January 2, 1933, the office of State Treasurer had not been "vacated by death," or by "resignation," or in so far as the record discloses it had not "otherwise" been vacated.

It will be noted the Constitution uses the word "vacated," meaning vacated by an incumbent. Death and resignation are peculiar to personal affairs of the incumbent. The only "otherwise" provisions, for the vacation of an office at the time the issue arose between Mr. Stain and Mr. Christensen were removal by judicial proceedings and impeachment.

I concur in the view that Mr. Christensen was "entitled to hold over and discharge the duties of the office until his successor was elected and qualified," and I hold Mr. Stain is his successor. We divide upon the point as to when his successor has qualified or may qualify. I think Mr. Stain qualified January 2, 1933. If he did not, then Mr. Christensen is entitled to hold the office until Mr. Stain qualifies or until another successor is elected and qualified. I find no authority or power to cut short that term. The prevailing opinion, however, because of a law passed long after Mr. Stain's attempted qualification as interpreted, and Mr. Christensen's entering upon the hold-over term as held, sweeps both of them aside by giving effect to what appears to me to be a retroactive law.

That part of the 1933 Second Special Session Laws which is made applicable to Mr. Stain and Mr. Christensen is found in chapter 25:

"Whenever any person duly elected or appointed to any office of the state or any of its political subdivisions, fails to qualify for such office within sixty days after the date of beginning of the term of office for which he was elected or appointed, such office shall thereupon become vacant and shall be filled as provided by law. Whenever the bond of any officer of the state or of any of its political subdivisions is cancelled, revoked, annulled or otherwise becomes void or of no effect, without another proper bond being given so that continuance of bonded protection is afforded, the office of such officer shall thereupon become vacant and shall be billed as provided by law. Any elected or appointed official who has failed on the effective date of this act to qualify for the position to which he was elected or appointed, shall be deemed to come within the provisions of this act, and the office of such officer shall become vacant at the end of forty days after the effective date of this act unless legal bond is given before the expiration of such period, and such office shall be filled as provided by law."

I am of the opinion that the last sentence of the above-quoted section, whether "aimed at Mr. Stain" or not, is retroactive and as or if applied to any officer after he was elected and before the passage of the law is void. I am not questioning the general nature of the statute nor its application to "any elected or appointed official" who is elected or appointed after the effective date of the act, "who has failed * * * to qualify." Wherein I maintain the statute is retroactive is in applying it to Mr. Stain in the instant case or any other officer similarly situated. Counsel charge that the statute was aimed at Mr. Stain. Whether it was or not, the language of the last sentence is susceptible of such application to the facts as to justify the inference.

Under the state Constitution the judicial powers of the state are vested in the courts, except in matters relating to impeachment. It must, therefore, follow that the Legislature is without authority to declare upon matters judicial. The Legislature cannot declare an office vacant. It may declare what acts, or omissions, or facts may be grounds for a forfeiture or the making of a finding upon facts upon which the courts may decree a forfeiture or a vacancy.

It is suggested by counsel for Mr. Christensen that Mr. Hoge has not adopted as his theory of the case the validity especially of chapter 25 of the Second Special Session Laws of Utah 1933. The title of the act itself is suggestive of not only a declaration of a vacancy by the Legislature, but also of its contemplated retroactive effect. The title reads, "An Act Declaring Vacant the Office of a Person Failing to Quality or Whose Official Bond Becomes Void." Under the presented facts, the title may as well have read, "An Act Declaring Vacant the Office of" State Treasurer for failing to qualify. Thus, upon Mr. Stain's failure to qualify, both he and Mr. Christensen are by the words of the statute brushed aside and the office becomes vacant. Although general in its terms, the statute may not be applied to either Mr. Stain or Mr. Christensen without being spe-

cifically subject to the objection of being both a judicial declaration or legislative decree and retroactive.

Once one is elected and qualified, the right to an office is a property right. The compensation is fixed by law which, under the Utah Constitution, art. 7, § 20, may not be changed during the term, and the term is fixed by the Constitution, art. 7, § 1, which the Legislature has no power to change.

If Mr. Christensen had the right to hold over until his successor was elected and qualified is the law and as held by the prevailing opinion, or, as here maintained, until Mr. Stain qualified or perfected his right to the office by filing a bond, both were then in the situation of being possessed of a vested property right, protected by the provisions of the Constitution declaring that no state shall "deprive any person of life, liberty or property without due process of law."

If it was intended by the Legislature to cause or declare a forfeiture of any of the rights claimed by Mr. Stain or Mr. Christensen by the enactment of the statutes referred to, then those acts in so far as they abridged or deprived them of vested rights would be unconstitutional and void. If, however, the statutes are given only prospective effect, applicable to cases arising in the future, then their provisions are inoperative as to the parties to this proceeding.

I therefore conclude that Mr. Christensen is entitiled to hold over after the expiration of his term and until Mr. Stain qualifies, if he has not done so, or his successor is elected and qualified; that there is no vacancy calling for an appointment by the Governor. I conclude that Mr. Stain has been duly elected and qualified and was on January 2, 1933, upon his demand entitled to the office of State Treasurer; that the prayer of his petition should be granted and that he be put into possession thereof with all that by law properly appertains thereto.

On Petition for Rehearing.

ELIAS HANSEN, Justice.

Charles A. Stain has filed in this cause a petition for rehearing. The grounds upon which he seeks a rehearing are: (1) That if, as held by a majority of the court, the furnishing of a bond is a duty enjoined by law upon the State Treasurer, then such duty may not be exercised until the treasurer is actually in possession of the office: (2) that if the furnishing of a bond is a mere duty, then Mr. Stain was the de jure State Treasurer when he made demand upon Mr. Christensen for the office and he may not be deprived of the office of de jure State Treasurer except by impeachment proceedings as provided by article 6, §§ 17 to 20 of our state Constitution; (3) that the validity of the law requiring a State Treasurer to furnish a bond may not be aided by the doctrine of police power; (4) that an act should not be given retroactive effect unless the language of the act clearly indicates a legislative intent that it should be given such effect, that the Acts of the Second Special Session of the Legislature of 1933 (chapters 13, 25) may and should be so construed as not to be applicable to Mr. Stain because he was elected and acquired a vested right to the office of State Treasurer and the emoluments thereof before the Acts of 1933 became law; (5) that the opinion fails to determine when a successor to succeed Mr. Hoge shall be elected; (6) that the opinion fails to pass upon the constitutionality of the state depository law; and (7) that in the argument and in the briefs filed on behalf of Mr. Stain the claim was made by him that certain public officers who had control of the matter prevented him from securing a bond, that therefore Mr. Stain should, before being finally deprived of his right to the office of State Treasurer, be given a trial as by law provided upon the question of whether or not some public officer or officers prevented him from securing the required bond.

It will be noted from the opinion heretofore filed in this cause that the members of this court are not in entire accord

as to the generic term that should be applied to the requirement that the State Treasurer shall give a bond. After all it is the nature of the requirement rather than the classification thereof that is of primary importance. A further discussion of whether the requirement that the State Treasurer shall furnish a bond is to be regarded as a qualification, an assurance or a duty will be of but little, if any, aid in arriving at a proper solution of the questions which divide the parties to this proceeding. Suffice it to say that after further consideration a majority of this court continue to entertain the view that it was competent for the Legislature to enact a law to require an in-coming State Treasurer to give a bond before he is entitiled to be inducted into office, and that the legislative enactments relating to the giving of a bond, when viewed in the light of the purposes sought to be accomplished by such enactments, require that the prescribed bond be given before one elected State Treasurer is entitled to the possession of that office.

The second ground urged for rehearing is untenable. It would be an unwarranted extension of the functions of a proceeding in impeachment to inquire into and determine the legal effect of the failure of Mr. Stain to give the required bond. Our State Constitution, art 6, § 19, provides:

"The Governor and other State and Judicial officers, except justices of the peace, shall be liable to impeachment for high crimes, misdemeanors, or malfeasance in office. * * *"

Mr. Stain has never been "in office" as State Treasurer within the meaning of the constitutional provision just quoted. He is here complaining because he is not permitted to be "in office." His mere failure to give a bond is not a "high crime, misdemeanor, or malfeasance." It may be otherwise if he should, without bond, exercise some of the functions of State Treasurer. Section 103-26-1, R. S. Utah 1933. The Constitution of this state vests in the Supreme and district courts jurisdiction to issue writs of quo warranto. Article 8, §§ 4 and 7.

"Quo Warranto in its broadest sense is a proceeding to determine the right to the use or exercise of a franchise or office and to oust the holder from its enjoyment, if his claim is not well founded, or if he has forfeited his right to enjoy the privilege. * * *

"The writ of quo warranto is an ancient common-law writ and remedy. Indeed, it is one of the most ancient and most important writs known to the common law." 51 C. J. 309.

To the same effect is the text in 22 R. C. L. art. 661, § 4. The legal effect of Mr. Stain's failure to give a bond is a proper subject of inquiry and determination in this proceeding.

It is next urged that resort may not be had to the doctrine of police power in aid of the validity of the law which requires a State Treasurer to give a bond. If the requirement that the State Treasurer give a bond be regarded as a duty, there is no occasion to resort to the doctrine of police power to sustain the validity of the act, requiring the giving of a bond, because our state Constitution, art. 7, § 17, expressly prescribes that the State Treasurer "shall perform such duties as may be provided by law." But aside from the provisions of the Constitution just quoted, the authority is inherent in the lawmaking powers of the state to protect its public moneys. It is urged in the brief filed in support of the petition for rehearing that the police power of the state is primarily concerned with matters of health, crime, and public safety, and should not be extended to the giving of an official bond. The doctrine of the police power is not limited to the subjects mentioned. If it were so limited, nevertheless the protection of public health, the prevention of crime, and the promotion of public safety are so dependent upon the use of public funds that to deny the lawmaking power of the state authority to protect its public funds would be to weaken, if not indeed to destroy, the ability of the state to enforce any laws or regulation with respect to public health, to crime or to public safety. The enactment of laws without available funds to enforce the same is too frequently of no avail.

As to the fourth ground urged for a rehearing, Mr. Stain may not be heard to say that he did not know a bond was required of him as State Treasurer. There was such a law at the time of his election and for many years prior thereto. He had no right to assume that he would not be required to comply with the law nor that he would be given a longer time, if indeed as long a time, to furnish a bond as was given to him by the Act of the Second Special Session of the State Legislature of 1933 (chapter 25). The language of the act clearly brings him within its provision. He is in no position to successfully make the claim that the act is retroactive as to him or that he does not come within its provisions.

The matter of when a successor shall be elected to succeed Mr. Hoge is not involved in this controversy. If it were, that question is put at rest by the provisions of article 7, § 10, of our state Constitution and R. S. Utah 1933, § 25-1-7.

Nor is the question of the constitutionality of the depository law germane to the questions here presented. No issue is raised in the pleadings as to the bond furnished by Mr. Hoge not being as prescribed by law. It appears from an inspection of the certified copy of the bond that it is proper in both form and amount. It has been approved by the proper authority. We do not pass upon the question of whether or not the depository law infringes upon that provision of the Constitution which makes the State Treasurer the custodian of public moneys.

It is finally urged that Mr. Stain has not had an opportunity to be heard upon the merits of his claim that certain public officers prevented him from securing a bond. We observed in the opinion theretofore filed that no facts are alleged in Mr. Stain's petition for a writ of quo warranto which shows or tends to show that anyone has prevented him from securing a bond. No formal request has been made for leave to amend the original petition. In his petition for rehearing he does not inform us of the facts which he claims have prevented him from securing a

bond. Without being advised specifically of what he claims the facts to be in such respect, we are unable to determine whether his claim, if sustained, would change the results. Had Mr. Stain believed there were other facts which would aid his cause, he should have alleged the same in his petition. Had such claimed facts been alleged and controverted, we would have passed upon their materiality and if deemed material referred the matter to a proper forum to take testimony and determine the same. Mr. Stain had the right as of course to amend his petition before he submitted his cause for determination upon its merits. But having submitted the cause upon merits after full opportunity to plead all the facts upon which he apparently relied, he is not entitled to be further heard by way of pleading additional facts where, as here, no claim is made that such additional facts were unknown to him when he filed his petition. R. S. Utah 1933, § 104-14-3. Courts generally are liberal in the exercise of their discretion in permitting amendments to be made to pleadings after the time fixed by law. This cause was heard and determined on an agreed statement of facts. Having so submitted the cause, Mr. Stain should not now be permitted to again open the controversy because there are other facts which he believes might lead to a different result, especially where such other facts were known to him when he submitted the case on merits. There must be some limit to the time within which a party may amend his pleading otherwise there would be no end to litigation. In this cause Mr. Stain waited nearly a year before he brought this proceeding. In the meantime there was uncertainty as to who had the right to perform the duties of State Treasurer. Soon after his petition was filed a hearing was had and a decision rendered on merits. To now permit amended pleadings to be filed and new issues raised and tried would prolong this controversy beyond reasonable lengths.

The petition for rehearing is denied.

STRAUP, C. J., and FOLLAND and EPHRAIM HANSON, JJ., concur.

MOFFAT, Justice (dissenting).

It would serve no purpose to add further discussion to the already extended discussion of this case. The petition for a rehearing and the order of the majority of the court denying the petition specified seven points involved in the petition. Some of those questions in my opinion merit a more careful and extended examination. Some of them in my opinion state grounds justifying a rehearing of the cause. I therefore cannot give my assent to the order denying the petition for a rehearing.